RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
(subject to pro hac vice admission)
48 Dewitt Mills. Rd.
Hurley, NY 12433
Tel: 845-481-2622
rfk1954@gmail.com

KIMBERLY MACK ROSENBERG, ESQ.
(subject to pro hac vice admission)
General Counsel, Children's Health Defense
852 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
kim.mackrosenberg@childrenshealthdefense.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIERRE KORY, M.D., BRYAN TYSON, M.D., LETRINH HOANG, D.O., PHYSICIANS FOR INFORMED CONSENT, a not-for-profit corporation, and CHILDREN'S HEALTH DEFENSE, a not-for-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, REJI VARGHESE, in his official capacity as Executive Director of the Medical Board of California, ERIKA CALDERON, in her official capacity as Executive Officer of the Osteopathic Medical Board of California,<br><br>Defendants. | **Case No:**<br><br>**COMPLAINT** |

1          Complaint

Plaintiffs by their undersigned counsel, hereby allege against the Defendants as follows:

1.      This is a 42 U.S.C. section 1983 civil rights action for which this Court has jurisdiction under 28 U.S.C. section 1331. This Court has authority to grant the requested injunctive relief under 28 U.S.C. section 1343; the requested declaratory relief under 28 U.S.C. sections 2201 and 2202; and costs and attorneys' fees under 42 U.S.C. section 1988 (b).

2.      Venue is proper in the federal Eastern District of California pursuant to 28 U.S.C. section 1391 (b). Defendant ROB BONTA, the California Attorney General, has his principal office in this District, as does REJI VARGHESE, the Executive Director of the Medical Board of California, and ERICA CALDERON, the Executive Director of the Osteopathic Medical Board of California (both boards are referred to herein as "Boards"). Enforcement of the challenged actions by the individual Defendants in their official capacity takes place in this district.

## INTRODUCTION

3.      This is a follow-up action involving the parties in *Hoang v. Bonta* currently pending before the Hon. William B. Shubb.  *Hoang*, and its related case *Hoeg v. Newsom*, challenged AB 2098 enacted as Business and Professions Code section 2270, effective January 1, 2023, enjoined January 23, 2023, and repealed January 1, 2024. The law had granted the California medical boards the specific statutory authority to sanction physicians for providing information, recommendations, and advice to their patients which the boards considered to be "Covid misinformation" as defined in the repealed statute.

4.      Despite its repeal, the Medical Board of California (hereinafter the "Medical Board") is still targeting "Covid misinformation", and physicians are still being intimidated and threatened by disciplinary action. The only difference is that now the investigations and public threats are based on the general standard of care statute. The Medical Board continues to ally itself with, and adopt the recommendations of, the Federation of State Medical Boards (the "Federation"), which calls for its member medical boards to prosecute physicians for "Covid

misinformation."[1]

5.    Plaintiffs expect the Defendants to make the same argument they made in *Hoang* and *Hoeg* (and the two other AB 2098 lawsuits), namely that all communications between a doctor and patient are part of patient/medical care, and hence unprotected by the First Amendment under the so-called professional speech exception.

6.    However, the professional speech exception was specifically rejected by the Supreme Court in *Nat'l Inst. Advocates & Life Advocates v. Becerra* ("*NIFLA*") 138 S. Ct. 2361, 2371-2373 (2018) which involved the previous unsuccessful effort by the California Legislature to impose government control over health care professionals' protected speech. And in so doing, the *NIFLA* court also rejected by name (*Pickup v Brown*) an earlier Ninth Circuit decision upholding yet another California Legislature's restriction on the protected speech by health care professionals.

7.    In rejecting these two prior restrictions to physician speech, the Supreme Court forcefully decried California (and other states) attempts to circumvent free speech protections of licensed professionals by the illegitimate transformation/recharacterization of all speech by a professional to a patient/client into unprotected professional conduct. *NIFLA*, 138 S. Ct. at 2371-73.

*8.*    Despite *NIFLA*'s clear statement to the state governments that they could not unprotect protected speech by its wholesale transmutation into conduct (i.e., patient/medical care), California passed AB 2098.  And how did that work out?

*9.*    We are now faced with the fourth time California is attempting to regulate protected speech by calling it conduct supposedly regulatable under standard of care authority.

---

[1]    *See*, *e.g.*, Stacy Weiner, *Is spreading medical misinformation a physician's free speech right? It's complicated*, AAMC.ORG (Dec. 26, 2023), https://www.aamc.org/news/spreading-medical-misinformation-physician-s-free-speech-right-it-s-complicated; *Enforcement Monitor Final Report Findings and Recommendations*, For Department of Consumer Affairs, MEDICAL BOARD OF CALIFORNIA (Aug. 18, 2023), https://www.mbc.ca.gov/Download/Reports/enforcement-report-final-2023.pdf; *Manual of Model Disciplinary Orders and Disciplinary Guidelines*, State of California, MEDICAL BOARD OF CALIFORNIA (12th Ed. 2016), https://www.mbc.ca.gov/Download/Documents/disciplinary-guidelines.pdf.

10.     When does it end? Plaintiffs ask the Court to send a clear message to the Defendants that the government does not get to "manipulate the content of doctor-patient discourse..." (*NIFLA,* 138 S. Ct. at 2374) by censoring and sanctioning physicians for providing information and expressing opinions that the government does not want patients to hear. Such government overreach is common in the world's most repressive regimes, but should not be countenanced here. [2]

11.     From the pandemic's beginning, the public health authorities have continuously apologized to the public for its erratic and oftentimes contradictory edicts about masking, the use of ventilators, the wishful thinking, if not fraudulent edicts about the ability of the vaccines to prevent infection and transmission.[3] Slowly, the public and the courts are starting to recognize that the primary purveyors of Covid misinformation are the public health authorities and their enforcers like the Defendants, not the physicians who challenge these irrational, magical thinking, and often short-lived edicts.

12.     It has been four years since the start of the pandemic, and nine months after President Biden said the pandemic is over. If not now, when does California's pandemic generated attack on physicians' First Amendment rights end?

## THE PLAINTIFFS AND THEIR STANDING

13.     Plaintiff Pierre Kory, MD is a critical care doctor and a co-founder and president of the Front Line COVID-19 Critical Care Alliance ("FLCCC"), an organization which, *inter alia* advocates for the use of Ivermectin as a treatment for the virus.

14.     He is a co-author of several peer reviewed articles on Ivermectin[4] and he has written a book aptly titled *The War on Ivermectin* which is a detailed description about how

---

[2]     *See NIFLA,* 138 S. Ct. at 2374, *quoting Wollschlaeger v. Governor*, 848 F.3d 1293, 1325 (11th Cir. 2017) (*en banc*), (W. Pryor, J. concurring).

[3]     *See* footnote 12 on page 19 for references to some of these apologies.

[4]     *See, e.g., Review Of The Emerging Evidence Demonstrating The Efficacy Of Ivermectin In The Prophylaxis And Treatment Of Covid-19*, AM. J. THER, 2021 May-June 28(3): E299-E318, https://www.ncbi.nlm.nih.gov/pmc/articles/pmc8088823/.

those in power and authority have engaged in a campaign of disparagement against Ivermectin and personally attack pioneers like him who advocate for its use.[5,6]

24    Dr. Kory and his fellow FLCCC members have successfully treated over 5,000 Covid patients with the drug. The medical authorities consider all these successfully treated patients to be merely anecdotal evidence. However, the patients and their family members would either disagree, or else do not care and are grateful that there are physicians brave enough to stand up and do what they in their experience think is the best treatment. Dr. Kory laments that somehow the clinical experience of scores of doctors who have treated many thousands of patients has been disvalued.

25.    Dr. Kory has testified twice before congressional committees, as well as state Legislatures in Pennsylvania, Maryland, and Wisconsin. He is one of the country's leading advocates for the off-label use of Ivermectin.

26.    Dr. Kory provided important evidence in *Stock v. Gray*, No. 2:22-CV-04104-DGK, 2023 U.S. Dist. LEXIS 48300, at *8-9, *23-24 (W.D. Mo. Mar. 22, 2023), where the district court granted a preliminary injunction against a Covid misinformation statute in Missouri, and pointed out that:

> Numerous lawmakers also endorsed Dr. Kory's testimony and promoted ivermectin as a COVID-19 drug.... The Court concludes Stock is likely to demonstrate that the statute is unconstitutional. Because Stock has demonstrated a likelihood of success on her First Amendment claim, the other requirements for

---

[5]    Like all wars where medical mavericks take on the so called "contemporary scientific consensus," there are attacks against the maverick doctors and this is no exception. Recently, the private internal medicine board ("ABIM") removed Dr. Kory and two other physicians' board certification for spreading Covid "misinformation," but of course a private organization has no obligation to comply with the First Amendment. In addition, he and other authors of a published article were forced to retract a publication (not the one cited above). That all comes with the turf of fighting the medical establishment, sometimes known as the church of medical orthodoxy. *See Galileo's Lawyer*, Richard Jaffe, 2008, Chapters 1-9.

[6]    There are now 99 published studies from around the world, many of which are fully controlled, which demonstrate the benefit of the drug for Covid. A list of these publications can be found at https://c19ivm.org/. A systematic review of the flaws of the studies which have not demonstrated efficacy can be found at such reputable source, and see the article referenced in footnote 4 above.

obtaining a preliminary injunction are deemed satisfied. *Rodgers*, 942 F.3d at 456. Conclusion. For the reasons discussed above, Plaintiff's motion for a preliminary injunction is GRANTED. Defendants are prohibited from reviewing, investigating, prosecuting, adjudicating, or enforcing violations of the second sentence of Missouri Revised Statute § 338.055.7 until after a final order is entered.

27.    Dr. Kory has a telehealth medical practice providing information and advising patients and maintains a California license, and consults with California based patients.

28.    As a leading expert on Ivermectin, Dr. Kory's consulting medical practice includes dealing with patients with questions and concerns about Ivermectin, and whether he recommends its use.

29.    He of course explains that the drug is FDA approved, but not specifically for Covid, and hence would only be available off label. He informs patients that there are some published studies and meta studies showing that the drug is not effective for Covid, but also explains that currently there are 99 controlled studies, both observational and randomized from around the world, the summary analysis of which demonstrates a statistically significant efficacy reducing mortality, hospitalization, rates of viral clearance, and rates of clinical recovery. Of note is that the WHO, in their last guideline recommendation, found that ivermectin use led to an 81% reduction in mortality, yet a recommendation for use was never issued. He disagrees with this decision, for obvious reasons. His patients understand that the FDA, the manufacturer, and all mainstream medical associations recommend against the use of the drug for Covid, but patients consult with him specifically to obtain his perspective.

30.    Dr. Kory has significant and reasonable concerns regarding the statement by AB 2098 sponsor Evan Low that despite the repeal, the medical boards will continue to investigate, prosecute, and sanction physicians who depart from the mainstream Covid narrative. See Exhibit A hereto with the statement. Furthermore, there is at least one such medical board prosecution already forcing a physician to surrender her license to the Board. See *In the Matter of the Accusation Against: Ana Rebecca Reyna, M.D.*, Medical Board of California (Accusation June 23, 2023; Decision December 21, 2023; Case No. 800-2021-076688),

available at https://www2.mbc.ca.gov/BreezePDL/document.aspx?path=%5cDIDOCS%5c20231222%5cDMRAAAJD2%5c&did=AAAJD231222191633890.DID.

31.     Accordingly, Dr. Kory has a direct interest in the subject matter of this lawsuit. His protected speech to his patients is being threatened and chilled, which, upon information and belief, is exactly what Assemblyman Low and others who support the repression of physician speech intend.

32.     Plaintiff Brian Tyson, M.D. is a board-certified family practitioner who owns an urgent care facility in Southern California. Since the beginning of the pandemic, he has successively treated thousands of Covid patients with a variety of medications, on and off label.

33.     As part of his practice, he has occasion to inquire about the vaccine status of patients. One specific context is providing physicals for high school and college athletes. Some athletes have reported chest pains, which requires inquiring about vaccine status since known side effects of the Covid vaccines are heart-related issues like myocarditis.

34.     This inquiry almost always leads to a discussion of the safety and efficacy of the vaccines and whether the reported side effects were caused by the vaccine. Dr. Tyson provides information and his opinions based on his research, which is not the same as the CDC's position that these side effects are exceedingly rare. Dr. Tyson's opinion is in part based on the thousands of vaccinated patients he has seen since the start of the pandemic and the dozens of patients who have first experienced chest pains after receiving one or more Covid shots. More disturbingly, most of the patients reporting chest pains have had the original shots plus at least one booster.

35.     Once a patient reports chest pains (whether temporally associated with the Covid vaccine), Dr. Tyson refers the student athlete to a cardiologist and will not clear the student to play sports unless or until the cardiologist signs off.

36.     Dr. Tyson's discussion with these patients may implicate or trigger a medical board's investigation and prosecution since he is not providing the CDC and FDA's mantra that vaccines are completely safe and cardiac side effects are exceedingly rare.

37.     Another type of patient interaction which may trigger an investigation is when treating Covid patients who are fully vaccinated and boosted (and most of his Covid patients are in this category), he is frequently asked whether they should keep getting boosted. Since he is now an urgent care doctor and not a PCP (primary care physician), he has the status not to answer the question and can refer the patient to his/her PCP. He does this out of an abundance of caution to avoid problems with the medical board.

38.     Dr. Tyson was previously investigated for over a year by the medical board for allegedly spreading Covid "misinformation" to the public, but that investigation was terminated earlier in 2023 without any disciplinary action taken.

39.     Based on the above, Dr. Tyson has a reasonable and grounded fear that his protected speech to patients might subject him to further board investigation and possible prosecution. As indicated, his protected speech is being chilled by the medical board's conduct.

40.     Plaintiff Le Trinh Hoang, is a pediatric osteopathic physician. Dr. Hoang has an office in Los Angeles County. She had been licensed by the Board for more than twenty-five years and treats children and sees adults for osteopathic muscular treatments.

41.     Her practice includes advising her patients (and their families) about the risk versus benefits of Covid vaccines and boosters, based on the patient's age, health status, and co-morbidities. The level of detail or granularity of the information she conveys to patients depends on the patient (or the family member in the case of young children) and can range from just the broad strokes to discussion of the latest literature on vaccines and the reported deficits in the science behind FDA approved or Emergency Use Authorization ("EUA") drugs.

42.     Of course, her patients are informed of the exact FDA status of the vaccine or drug (in the case of Covid treatment drugs) and the government's recommendation. Dr. Hoang would like to provide information to her male patients between ages 17-39 of the increased risks of cardiomyopathy and other cardiac serious adverse events of the mRNA shots to this patient subset. This information is evidence based and widely reported in the medical

literature.[7]  It may not be consistent with the U.S. infectious disease consensus, but the increased risk is plainly evidence based. Here again, the level of detail would depend on physician judgment and experience with the patient. Assuming Plaintiff Hoang provides this important information (in whatever the level of detail) to a patient and recommends against the vaccine for such a patient, Dr. Hoang believes she may be prosecuted for a standard of care violation for her fully protected speech based on AB 2098's bill sponsor statements and the fact that the medical board has prosecuted and disciplined one physician for information and opinions shared with a patient.

43.     Sometimes, her patients ask her to comment on the general reliability of the CDC's edicts and the fact that the edicts seem to change so frequently and sometimes in a contradictory fashion.

44.     Here again, Dr. Hoang would like to continue to provide such truthful information and evidence-based advice to her patients, but since this information and advice could be targeted as a violation of the standard of care, she is reluctant to do so unless this Court enjoins the Boards from using prosecutorial power to chill free speech.

45.     As of the date of the filing of this Amended Complaint, Plaintiff Hoang intends to provide her patients with the best available information concerning the safety and efficacy of vaccines and Covid treatments, even where such information and recommendations might fall within her board's view that it violates the standard of care.

40.     Plaintiff Physicians for Informed Consent (PIC) is a 501(c)(3) not-for-profit corporation based in California whose mission is, *inter alia*, to advocate for the right of physicians to provide true and evidence-based information to patients concerning the risks and benefits of vaccines. Many of its members are physicians, other health care professionals, and

---

[7]     *See, e.g.*, Oster et al., *Myocarditis Cases Reported After mRNA-Based COVID-19 Vaccination in the US From December 2020 to August 2021* that found the risk of myocarditis after receiving mRNA-based COVID-19 vaccines was increased across multiple age and sex strata and was highest after the second vaccination dose in adolescent males and young men. 2021. *JAMA*. 2022;327(4):331–340. doi:10.1001/jama.2021.24110, https://pubmed.ncbi.nlm.nih.gov/35076665/.

scientists who publish and speak about vaccine safety and efficacy issues.

41.   PIC is deeply involved in identifying, collecting, and analyzing the evolving *worldwide* scientific literature on vaccine safety and efficacy. It writes up summaries of these studies and disseminates this information to physicians, so that they can provide their patients with the best available information selected from the United States and throughout the world.

42.   The scientific evidence collected and distributed by PIC is sometimes at odds with what is at any given time the view of the U.S. health authorities and what may be the U.S. scientific consensus. However, such information is based on the best available worldwide evidence. And frequently, PIC's written summaries have foreshadowed changes subsequently made to the mainstream scientific consensus.

43.   PIC also supports the rights of its members to advise about and prescribe the off-label use of drugs such as Ivermectin and HCQ in the treatment of Covid-19. PIC provides its physician members with information about the hundreds of studies (as of the date of this Complaint) which support the use of these drugs, and encourages its physician members to discuss these studies (and the studies which do not show a benefit) with their patients. However, PIC's physician members are uncertain whether providing patients with studies which have found a benefit would violate the Board's stated position that it can still discipline physicians for Covid "misinformation" despite the repeal of Business and Professions Code section 2270.

44.   Some patients ask PIC physician members specifically whether there are any studies which support the use of Ivermectin. Arguably, responding to this question truthfully could be considered spreading Covid misinformation to the patient, but responding in the negative would be false. Some physicians respond by advising patients that in fact there are many such studies, but those studies receive limited or no recognition within certain medical communities for many different reasons, and the only studies the FDA currently recognizes for purposes of standard of care are those studies which have not found a benefit. Would conveying this information be sanctionable under the Boards' interpretations of the law? Any answer would be arbitrary and untethered to principle.

45.     Because the Board still maintains that it has the right to discipline physicians in violation of their (and their patients') constitutional rights, many of PIC's physician members are faced with choosing between providing accurate and complete information about the risks of the vaccine and the different Covid treatments, putting them at risk of Board investigation and discipline, or reciting the latest FDA and CDC-promulgated edict. Or they can choose to keep silent and refuse to answer questions about the latest Covid booster and Covid treatments. This choice is a necessary but completely intolerable result of the Board's pronouncements and actions. Indeed, primary care physicians like Plaintiff Hoang (a PIC member) are especially pincered under Business and Professions Code section 2234 (the very statute the Boards claim as authority over misinformation), because primary care physicians are routinely expected to *answer* patient inquiries and not deflect. Not only deflection but also hesitation to candidly answer can and does injure the doctor-patient relationship.

46.     Moreover, due to the Boards' broad power to investigate physicians, many of PIC's physician members are afraid of speaking out in public or even to publicly support this case for fear of triggering a Covid misinformation investigation. Accordingly, the Boards' position on providing information contrary to the government's edicts has a chilling effect of PIC physicians' free speech rights.

47.     PIC's physician members in California who wish to disseminate information to their patients, like the information which the two individual Plaintiffs seek to disseminate, would have standing to participate in this action.

48.     PIC's physician rights it seeks to assert in this case are germane to and go to the very heart of the organization's educational purpose "to deliver data on infectious diseases and vaccines."

49.     Neither the claims asserted herein nor the relief requested require the participation of PIC's individual member physicians in this lawsuit. Accordingly, PIC has associational standing to protect the constitutional rights of its physician members in California.

50.     In addition, the foregoing paragraphs regarding PIC can also be said for PIC's

lay members in California who wish to receive the information which is or could be deemed disciplinable conduct. There is an obvious stigma and intimidation upon patients if their medical records are subpoenaed by the medical board, and the patients are then called as witnesses to remember what their doctor told them about Ivermectin studies a year or two years earlier. History has shown a healthy doctor-patient relationship needs the First Amendment. Many of PIC's lay members would like to be able to candidly receive information about off-label drugs for Covid-19 if they contract the virus. Therefore, PIC has associational standing to sue on behalf of its lay members in California on the claims for relief in this case.

51.     Plaintiff Children's Health Defense is a 501(c)(3) non-profit corporation whose mission is to end childhood health epidemics by working aggressively to eliminate harmful exposures, hold those responsible accountable, and to establish safeguards to prevent future harm. Its mission also includes advocating for medical freedom, bodily autonomy, and an individual's right to receive the best information available based on a physician's best judgment.

52.     CHD educates and advocates concerning the negative risk-benefit profile of the Covid shots for healthy children, and concerns such as these have caused some of the countries (which have had the best pandemic response outcomes) to stop recommending Covid vaccination or boosters, or both, for healthy children (see recent recommendations of Denmark, Sweden, the UK, and the European Medicines Agency).

53.     CHD members include numerous California physicians who wish to provide information about the latest studies about the Covid booster shots, as well as information about the off-label treatments for Covid. California parents who are CHD members want to receive objective, non-coerced information from California physicians about the risk profile of the Covid vaccines for the current boosters.

54.     However, the Board's statements that it will take action against physicians for providing information and opinions challenging the mainstream Covid narrative will have a chilling effect and will dissuade many physicians from providing their candid opinions, which

creates a risk of self-censorship significantly impairing the ability of CHD physicians to provide such information, which will militate against CHD lay members in California from receiving such nonconforming opinions from their physicians. An actual and justiciable controversy exists therefore between Plaintiff CHD and Defendants.

55.     Plaintiff CHD sues in its own capacity and on behalf of its constituent members in California who have been and will continue to be adversely affected by Defendants' actions.

56.     CHD members would have been able to sue. The interests which CHD seeks to protect are germane to and go to the heart of CHD's purpose. Neither the claims asserted nor the relief requested requires the participation of CHD's individual members in this lawsuit.

57.     None of the individual plaintiffs are currently the subject of investigation or prosecution by the Defendants. To the best of the organizational plaintiffs' knowledge and belief, none of their California physician members are subject to investigation or prosecution by the Defendants.

## THE DEFENDANTS

33.     Defendant ROB BONTA is the California Attorney General and is thus the ultimate decisionmaker in the Attorney General's office who enforces the laws of the State of California, including Business and Professions Code section 2234, the general statutory standard of care statute. He is a defendant in his official capacity only.

34.     Upon information and belief, the Attorney General's office represents the two medical boards in administrative actions against its licensees, including participating in initial interviews with the licensees in the investigation phase of board proceedings, preparing accusations against the licensees and acting as the prosecutor in disciplinary actions. Accordingly, Defendant Bonta has the authority to stop the Attorney General's office from preparing and filing accusations against the Boards' licensees, if this Court grants the relief requested.

35.     Defendant REJI VARGHESE is the executive director of the Medical Board of California. He is a defendant in this case in his official capacity only for the requested declaratory and injunctive relief.

36.     Upon information and belief, Defendant VARGHESE is the final decision-maker on the Board's decision to investigate physicians for violations for providing Covid misinformation, or at least he supervises the subordinate Board employee(s) who make such decisions.

37.     Upon information and belief, Defendant VARGHESE has the authority to implement a preliminary and permanent injunction stopping the Board from investigating and filing charges against a medical doctor for an alleged standard of care violation based on the licensee's exercising his/her protected speech rights to patients on the subject (content) about Covid and which does not conform with the CDC's narrative, to wit, the viewpoint of the speech.

38.     Defendant ERIKA CALDERON is the executive director of the Osteopathic Medical Board of California. She is a defendant in this case in her official capacity for the requested declaratory and injunctive relief.

39.     Upon information and belief, Defendant CALDERON is the final decisionmaker on the Osteopathic Board's decision to investigate physicians for providing so-called Covid misinformation to patients, or at least she supervises the subordinate employee(s) who make such decisions.

40.     Upon information and belief, Defendant CALDERON has the authority to implement a preliminary and permanent injunction stopping the Board from investigating and filing charges against a medical doctor for an alleged standard of care violation based on the licensee's exercising his/her protected speech rights to patients on the subject (content) about Covid and which does not conform with the CDC's narrative, to wit, the viewpoint of the speech.

**FACTUAL BACKGROUND**

**The Origins of Nationwide Covid Misinformation Disciplinary Campaign**

41.     By press release dated July 21, 2021, the Federation of State Medical Boards (the

14          Complaint

"Federation"[8]) issued the following press release:

> Physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary action by state medical boards, including the suspension or revocation of their medical license. Due to the specialized knowledge and training, licensed physicians possess a high degree of public trust and therefore have a powerful platform in society, whether they recognize it or not. They also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factually, scientifically grounded and consensus driven for the betterment of public health. Spreading inaccurate COVID-19 vaccine information contradicts that responsibility, threatens to further erode public trust in the medical profession and thus puts all patients at risk.

*FSMB: Spreading Covid-19 Vaccine Misinformation May Put Medical License At Risk*, FEDERATION OF STATE MEDICAL BOARDS, News Releases (Jul. 29, 2021), https://www.fsmb.org/advocacy/news-releases/fsmb-spreading-covid-19-vaccine-misinformation-may-put-medical-license-at-risk/.

    42.    Upon information and belief, Kristina Lawson is or was the Chairman of the Federation's Ethics Committee, the California medical board's representative to the Federation, and the President of the Medical Board.

    43.    The following statement by Board President Kristina D. Lawson, appears in the Board's February 10-11, 2022 meeting minutes:

> Ms. Lawson stated it is the duty of the board to protect the public from misinformation and disinformation by physicians, noting the increase in the dissemination of healthcare related misinformation and disinformation on social media platforms, in the media, and online, putting patient lives at risk in causing unnecessary strain on the healthcare system.

---

[8]    According to its website, "The Federation of State Medical Boards represents the state medical and osteopathic regulatory boards – commonly referred to as state medical boards – within the United States, its territories and the District of Columbia. It supports its member boards as they fulfill their mandate of protecting the public's health, safety and welfare through the proper licensing, disciplining, and regulation of physicians and, in most jurisdictions, other health care professionals." *About FSMB*, FEDERATION OF STATE MEDICAL BOARDS, https://www.fsmb.org/about-fsmb/.

Ms. Lawson elaborated in July 2021, the Federation of State Medical Boards released a statement saying physicians spreading misinformation or disinformation risk disciplinary action by their state medical board.

44. The Federation's press release is listed as a rationale for AB 2098, which was introduced on February 14, 2022. In its original form, the bill tracked the Federation's press release (and Board President Lawson's statement in the minutes) and targeted the public speech of physicians in addition to communications between physicians and patients.[9]

45. AB 2098 as amended was passed by the Legislature and signed into law by Governor Newsom September 30, 2022.

**AB 2098/Section 2270, Its Injunction and Repeal**

46. On January 1. 2023, AB 2098 became effective as Business and Professions Code section 2270, which law implemented the Federation's Covid misinformation press release, limited to communications between doctors and patients "in the form of treatment or advice." Bus. & Prof. Code, § 2270(a)(3).

47. The law defined Covid misinformation as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." *Id*. subparagraph (4).

48. On January 23, 2023, the law was preliminarily enjoined on Fifth Amendment grounds by Eastern District Judge William B. Shubb in two related cases, *Hoang v. Bonta*, and *Høeg v. Newsom*, No. 2:22-cv-01980 WBS AC, 652 F.Supp.3d 1172, 2023 WL 414258 (E.D. Cal. Jan. 23, 2023), with respect to three of the five Plaintiffs and two of the three defendants in this case.[10]

49. In September, 2023, the Legislature added a provision to SB 815 which would

---

[9]     AB 2098 references the Federation's July 2021 press release as justification for the bill. *California Legislative Information,* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2098#99INT, Section 1 (f).

[10]     Two other cases were filed against the law. In *McDonald v. Lawson,* a Central District judge denied a similar preliminary injunction motion which decision is currently *sub judicia* before the Ninth Circuit, together with the fourth case. *McDonald v. Lawson*, Nos. 22-56220, 23-55069, 2023 U.S. App. LEXIS 27561 (9th Cir. Oct. 17, 2023).

repeal Section 2270 as of January 1, 2024. On September 30, 2023, the Governor signed SB 815.

**Statements and Actions by the Medical Board and AB 2098's Sponsor Demonstrating that the Medical Boards Intend to Continue Violating the Free Speech Rights of Physicians**

50.     News that the California Legislature was repealing Section 2270 was first reported in a Los Angeles Times article on September 11, 2023 (copy attached to this Complaint as Exhibit A).

51.     The article quoted a spokesman for sponsor Evan Low as saying, "Fortunately, with this update, the Medical Board of California will continue to maintain the authority to hold medical licensees accountable for deviating from the standard of care and misinforming their patients about COVID-19 treatments." Mr. Low's statement is consistent with the Federation's position, which is also the Medical Board's position, that it can discipline physicians for so-called Covid misinformation regardless of the repeal of AB 2098.[11]

52.     By December 2023, the Medical Board disciplined at least one physician for information, opinions, and recommendations she made to a patient about the vaccine, including her opinion the vaccine was associated with increases in miscarriages and that the patient's girlfriend should avoid the Covid shot if she wanted to get pregnant; and the physician shared other information about the vaccines and miscarriages. *See* ¶ 30, *ante* (Accusation, p. 4, ¶ 10, ln. 8 & ¶ 12, lns. 16-19).

53.     Plaintiffs maintain this kind of information is protected speech. And it is especially noteworthy there was no doctor-patient relationship between the physician and the patient's girlfriend. To be clear, this information would not have been sanctionable under Section 2270 since it was not said to a patient "in the form of treatment or advice." So, the Medical Board is exercising powers it did not even have under the repealed statute.

---

[11]     Accusation referenced in paragraph 30, *ante*; and *see* CALIFORNIA REGULATORY LAW REPORTER, Vol. 28, No. 2 (Spring 2023), https://digital.sandiego.edu/cgi/viewcontent.cgi?article=3149&context=crlr.

54.     Other examples of the conduct which the board unconstitutionally contended as disciplinable include opinions that

     a. masks do not stop the virus (even though recent published studies, including one reported by CNN, indicates the truth of this statement).

     b. Covid vaccines stop infection and transmission (this too was quickly proven false, as the CDC admitted after many studies proved it; so now the shots are in the category of vaccines that neither prevent infection nor stop transmission).

55.     The Medical Board also asserts that "all interactions that occur between a doctor and a patient, particularly during a clinic visit must be conducted professionally. There may be no limitation to what topics can be discussed between doctor and patient, but the discussion must remain professional." *See* ¶ 30, *ante* (Accusation at p. 5, ¶ 19, lns. 25-28). And thus, the medical board attempts to revive the professional speech exception to free speech which has been expressly rejected by the Supreme Court in *NIFLA*.

56.     However, all this information and opinion expressed by the doctor and charged in the Accusation involves First Amendment protected speech, according to all judicial authority (other than Judge Slaughter's opinion).

57.     Upon information and belief, members and or employees of the Medical Board continue to be in contact with the Federation, and they continue to push the Federation's agenda set out in its July 2021 press release, despite the clear unconstitutionality of that agenda, a constitutional fact which is known or should be known by the Medical Board's personnel as well as the Federation.

58.     The above referenced accusation and decision, together with the AB 2098 sponsor's statement, and the Medical Board's continued adherence to the Federation's policy/call-to-arms which created this Covid misinformation board sanctioning idea, clearly establish that the Defendants intend to continue to violate the free speech rights of California physicians.

59.     These actions send a chill throughout the part of the California medical community which questions the information put out by the CDC and other parts of the medical establishment.

60.     However, the more the public health authorities speak, the more the public loses faith and trust in the information and recommendations in the public health institutions' Covid edicts, despite the almost continuous failed results and the repeated empty promises that the public health authorities will do better.[12]

---

[12]     *See, e.g.*, Nicholas Florko, *Public trust in CDC, Fauci, and other top health officials is evaporating, poll finds*, STATNEWS.COM (Sept. 10, 2020), https://www.statnews.com/2020/09/10/trust-cdc-fauci-evaporating/ [Redfield];

Selena Simmons-Duffin, *Poll Finds Public Health Has A Trust Problem*, NPR.ORG, health (May 13, 2021), https://www.npr.org/2021/05/13/996331692/poll-finds-public-health-has-a-trust-problem [Walensky];

*The CDC is beholden to corporations and lost our trust. We need to start our own The People's CDC*, THEGUARDIAN.COM, opinion (Apr. 3, 2022), https://www.theguardian.com/commentisfree/2022/apr/03/peoples-cdc-covid-guidelines [Walensky];

*How to Make the CDC Matter Again*, BLOOMBERG.COM, Opinion (May 2, 2022) https://www.bloomberg.com/opinion/articles/2022-05-02/the-cdc-needs-reform-to-restore-public-trust-after-covid-19#xj4y7vzkg [Walensky];

Randy Aldridge, *CDC Announces Sweeping Changes to Restore Public Trust*, NORTH CAROLINA MEDICAL SOCIETY (Aug. 18, 2022), https://ncmedsoc.org/cdc-announces-sweeping-changes-to-restore-public-trust [Walensky];

Tina Reed, *Survey finds concern of political influence leads lack of trust in health agencies*, AXIOS.COM (May 7, 2023), https://www.axios.com/2023/03/07/trust-in-cdc-public-health-agencies ("too many conflicting recommendations"; "Private-sector influence on recommendations and policies" are the second and third most common reasons for lack of trust in the CDC) [Cohen];

NPR one year late, same tune: Sacha Pfeiffer, Megan Lim, Christopher Intagliata, *The new CDC director outlines 3 steps to rebuild trust with the public*, NPR.ORG (Aug. 2, 2023), https://www.npr.org/2023/08/02/1191302954/the-new-cdc-director-outlines-3-steps-to-rebuild-trust-with-the-public [Cohen];

Chelsea Cirruzzo, *The CDC wants your trust back: It'll 'take time to rebuild*,' POLITICO.COM (Sept. 16, 2023), https://www.politico.com/news/2023/09/16/cdc-director-public-trust-00116348 [Cohen].

61.     Upon information and belief, the public's lack of trust is not the result of what critics of the mainstream Covid narrative say in public or to patients. Rather, it is the overpromising of the benefits of the vaccines and every booster, even though they neither prevent infection or transmission, and whatever effectiveness they have is extremely short-lived, a fact which the public health authorities irrationally both downplay and use to justify each successive booster.

62.     Upon information and belief, between the studies which hint at a direct relationship between repeated boosters and increased risk of infection, excess death statistics which show increased deaths after the Covid vaccines were introduced (based on insurance company data from the United States and England), and the recent concern manifest from preliminary studies that increased Covid vaccinations are or may be associated with super cancers, plus the fact that emails and public testimony from public health officials which show that they have admitted or knowingly misled the public, it is no wonder that a significant percentage of the public does not believe what comes out of the mouths of the public health authorities and their proxies.[13]

63.     Upon information and belief, there is a disinformation campaign which has affected the public discourse. However, it is being orchestrated by the public health authorities with the help of corporate interests to foist on the public, *inter alia*, a never-ending number of boosters. Part of this disinformation campaign is to silence critics both through the Federation-inspired Covid misinformation laws or standard of care prosecutions. Another part of the overall campaign (though beyond the scope of this lawsuit) are the federal government's direct attempts to force, intimidate or cajole the social media companies to remove content which is

---

[13]     The individual Plaintiff physicians, the physician members of the two organizational Plaintiffs, and many other physicians have the possibly quaint notion that a physician has a professional obligation/duty of informed consent which would include apprising patients of potential risks (and the risks listed on the vaccines' labels), rather than simply robotically repeating the public health/standard of care mantra that the Covid shots and every booster have been proven to be completely safe and effective for everyone including young children and pregnant women, and everyone (over the age of six months) should take every booster.

not consistent with the government's public health narrative. All the time vilifying physicians and others who dare to speak up. This is straight from the Orwellian 1984 government's playbook. Newspeak is now the coin of the realm promoted by the public health authorities and their newspeak co-interlocutors.

64.     The false and misleading overselling of the safety and efficacy of the Covid vaccines and boosters is most poignantly demonstrated by a recent Elon Musk tweet of a video which is a montage of headlines and public health officials' statements initially making ludicrously false and exaggerated claims, and then having to backtrack, retract and explain away the evidence, all the time insisting that every booster (tested on 8 mice or in one case, 50 people over a two-week period of time) is safe and highly effective (because it increased antibodies for as long as two weeks, and that is called a surrogate endpoint), and that everyone over six months of age needs to take every shot and every booster to protect themselves and to protect the public. But the public is not buying it anymore, and the Musk tweeted montage shows why. *See* and view https://twitter.com/elonmusk/status/1706676593261785178.

65.     In times such as these, many people go to their physicians for information, advice, and recommendations about what they should do about Covid, prophylactically and for treatment. And the same will be true for the next pandemic. It is imperative that physicians be permitted to speak their minds without fear of government reprisal. This kind of physician/patient communication is within the heartland of the speech the First Amendment protects. And, that is exactly the subject of this lawsuit, whether the government's assault on this protected speech comes from a specific (and repealed) statute, or the general standard of care provision.

///
///
///
///
///
///

1

## FIRST CLAIM FOR RELIEF

2

3

**42 U.S.C. SECTION 1983 VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION ASSERTED AGAINST THE DEFENDANTS**

4

5

66.     Plaintiffs repeat and reallege the foregoing allegations.

6

67.     The First Amendment provides in relevant part: "Congress shall make no law...

7

abridging the freedom of speech." The First Amendment applies to actions by state agencies

8

such as the Boards via the Fourteenth Amendment.

9

68.     The individual plaintiffs and the members of organizational Plaintiffs CHD and

10

PIC's physicians have the right to free speech, including the right to freely communicate

11

information to their patients even if the government does not agree with the information

12

conveyed.

13

69.     Furthermore, the patients of the individual Plaintiffs, and CHD's and PIC's non-

14

physician members have the right to receive such information and engage in a genuine free

15

speech dialogue, even if the government does not agree with the information or message

16

conveyed by these physicians.

17

70.     The statements by the individual Plaintiffs and the organizational Plaintiffs

18

constitute a concrete plan to engage in activity, which based on statements and actions by the

19

Defendants and AB 2098's sponsor, strongly suggest that Plaintiffs' speech is within the zone

20

of prosecution under the current policy of prosecuting so-called "Covid misinformation."

21

71.     These same board actions and statements by the Boards' legislative supporters

22

communicated to the California public constitute an intended specific warning or threat to

23

initiate proceedings for the purpose of dissuading physicians from saying anything to patients

24

which is inconsistent with the government messaging concerning, *inter alia,* taking every

25

available Covid booster, and limiting Covid therapeutics to on-label FDA approved drugs.

26

72.     The fact that there is now at least one consummated disciplinary action against a

27

physician for alleged Covid misinformation under the pretext of a standard of care violation, in

28

conjunction with absence of any Medical Board statement that this prosecution is unique, is

sufficient for a finding of a prior history of enforcement, in the absence of any evidence to the contrary. Accordingly, Plaintiffs have satisfied the three requisite elements for First Amendment standing. *Høeg v. Newsom*, No. 2:22-cv-01980 WBS AC, 652 F.Supp.3d 1172, 2023 WL 414258, page 6-14 (E.D. Cal. Jan. 25, 2023) (Dkt Entry 30 in *Hoang v. Bonta*). Absent injunctive and declaratory relief against Defendants, Plaintiffs will have been and will continue to be harmed in the manner specified herein. Plaintiffs have no plain, speedy, and adequate remedy at law to prevent Defendants from continuing to chill speech and continuing additional prosecutions for so-called Covid misinformation.

73.    The Medical Board's practice and policy of investigating and sanctioning physicians for their protected speech is a violation of the First Amendment rights of physicians to convey information to patients, and the patients' First Amendment rights to receive such information.

74.    Further, the anticipated defense that the Defendants have the statutory authority to enforce the standard of care as justification would render the statutes unconstitutionally overbroad.

75.    Upon information and belief, there can be no clearly defined standard of care during this rapidly evolving pandemic in terms of Covid treatments and recommendations. There are only public health edicts based on the last and usually incomplete and often cherry-picked data, while downplaying or avoiding non-supporting data.  The data and edicts change with such rapidity that the standard of care concept becomes distorted and completely inconsistent with the collective experience of front-line physicians treating the disease. As a result, the standard of care does not provide sufficient guidance to justify interference with physicians' protected speech under any form of heightened scrutiny.

76.    For the foregoing reasons, pursuant to 42 U.S.C section 1983, Plaintiffs request a declaratory judgment that it is a First Amendment violation for the California medical boards to investigate, prosecute or sanction physicians based on information and opinions they provide to patients concerning the safety and efficacy of Covid vaccines, FDA approved drug treatments for Covid whether on or off label, or dietary supplements, or public health measures

1  such as the benefits of masks, at least as long as there is some published scientific evidence
2  supporting the information, opinions, recommendations or advice. Plaintiffs seek preliminary
3  and permanent injunctive relief preventing the commencement of any such investigation or
4  prosecution.

5  77.     With respect to recommendations or advice, Plaintiffs seek a declaration that the
6  Boards do not have the First Amendment constitutional authority to investigate, prosecute or
7  sanction physicians for providing such recommendations about Covid vaccines/boosters, or on
8  or off-label FDA approved treatments for Covid, or for any other Covid-related subject, at least
9  so long as there is some published scientific evidence supporting the recommendation or
10  advice. Pursuant to 42 U.S.C. section 1983 and Federal Rules of Civil Procedure, rule 65,
11  Plaintiffs seek preliminary and permanent injunctive relief preventing the commencement of
12  any such investigation or prosecution.

13

14      WHEREFORE the Plaintiffs request that judgment be entered in their favor and against
15  the Defendants as set forth in this First Amended Complaint and specifically that the Court:

16      1.  Issue a declaratory judgment that it is a First Amendment violation for the
17          Defendants to investigate, prosecute or sanction physicians based on information,
18          opinions, recommendations or advice they provide to patients concerning the safety
19          and efficacy of Covid vaccines, FDA approved drug treatments for Covid whether
20          on or off label, or dietary supplements, or public health measures such as the
21          benefits of masks, based on their statutory authority to enforce the standard of care,
22          so long as there is some published scientific evidence supporting the information,
23          opinions, recommendation or advice.

24      2.  Issue a preliminary and then permanent injunction enjoining the Defendants from
25          commencing any such investigation or prosecution in violation of the First
26          Amendment rights of physicians and their patients.

27      3.  Costs and attorneys' fees as permitted by law.

28      4.  Such other and further relief as the Court deems just and proper.

1   Dated: January 1, 2024

2                                   Respectfully submitted,

RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
(subject to pro hac vice admission)
48 Dewitt Mills. Rd.
Hurley, NY 12433
Tel: 845-481-2622
rfk1954@gmail.com

KIMBERLY MACK ROSENBERG, ESQ.
(subject to pro hac vice admission)
General Counsel, Children's Health Defense
852 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
kim.mackrosenberg@childrenshealthdefense.org

Attorneys for Plaintiffs