RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
*Pro hac vice* admitted
48 Dewitt Mills. Rd.
Hurley, NY 12433
Tel: 845-481-2622

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIERRE KORY, M.D., LE TRINH HOANG, D.O., BRIAN TYSON, M.D., PHYSICIANS FOR INFORMED CONSENT, a not-for-profit corporation and, CHILDREN'S HEALTH DEFENSE, a not-for-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA In his official capacity as Attorney General of California, REJI VARGHESE, in his official capacity as Executive Director of the Medical Board of California, ERIKA CALDERON, in her official capacity as Executive Officer of the Osteopathic Medical Board of California; and<br><br>Defendants. | Case No: **2:24-cv-00001 WBS-AC**<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW**<br><br>**Date:** April 1, 2024<br>**Time:** 1:30 PM<br>**Courtroom:** 5, 14th Floor<br><br>Action Filed: January 2, 2024 |

**TO DEFENDANTS AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 1, 2024, at 1:30 p.m. or as soon thereafter as the matter may be heard, at the United States District Court for the Eastern District of California, in courtroom number 5, 14th Floor, 501 I Street, Sacramento, California, the Plaintiffs will move for an order granting preliminary injunctive relief.

Pursuant to Federal Rules of Civil Procedure 65, Plaintiffs seek a preliminary injunction to enjoin Defendants ROB BONTA, REIJI VARGHESE, and ERIKA CALDERON, from investigating, filing an accusation against, or disciplining any physician or osteopathic physician based on the information, recommendations or advice provided to patients with respect to Covid 19 under their purported authority of Business and Professions Code Section 2234, subdivision (c) or such other statutory authority in the Business and Professions Code.

This motion is based on Plaintiffs' Notice of Motion and Motion, the Declarations of Plaintiffs Pierre Kory, M.D., Le Trinh Hoang, D.O., Brian, Tyson, M.D., Sanjay Verma, M.D., Debbie Hobel and Neil Selflinger, and all papers and records on file with the Court or which may be submitted prior to the time of the hearing, any oral argument, and any further evidence which may be offered.

Dated: February 10, 2024

RESPECTFULLY SUBMITTED,

RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
*Pro hac vice* admitted
48 Dewitt Mills. Rd.
Hurley, NY 12433
Tel: 845-481-2622

Attorneys for Plaintiffs

Motion for Preliminary Injunction

# <u>TABLE OF CONTENTS</u>

<u>**Page #**</u>

TABLE OF AUTHORITIES ....................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II.   STATEMENT OF FACTS ................................................................................ 3

    A.   Overlapping Parties and the Same Targeted Speech is Involved in all Three Lawsuits ................................................................................................ 3

    B.   Plaintiffs' Evidence ............................................................................... 4

III.   THE PRELIMINARY INJUNCTION STANDARD IN A FIRST AMENDMENT CASE ...................................................................................... 7

IV.   PLAINTIFFS' ARTICLE III STANDING ....................................................... 8

ARGUMENT ............................................................................................................ 10

V.   PLAINTIFFS CAN DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THE FIRST AMENDMENT FREE SPEECH CLAIM. ............................ 10

    A.   Under General First Amendment Principles the Defendants' Present and Future Attempts to Sanction Physicians for their Speech to Patients Based on Covid Content and Viewpoint is Subject to Strict Scrutiny ................................ 10

    B.   The Defendants' Actions Fail Under Strict Scrutiny ........................... 11

        1.   What is the Compelling State Interest to Restrict Physician Free Speech after Four Years of Many Wrong Covid Edicts and Failed Policies and Treatment Recommendations? ............................... 11

        2.   Defendants Cannot Meet Their Heavy Burden To Prove That Other Less Restrictive Means Were Considered and Rejected by Necessity. ..... 13

        3.   Defendants Cannot Meet Their Heavy Burden to Prove That Restricting California Physicians' Free Speech Is Necessary to Achieve the Compelling State Interest. ....................................... 15

        4.   The Defendants' Policy/Interpretation of Its Standard of Care Authority Is Fatally Underinclusive. .......................................... 15

        5.   The Defendants' Policy/Interpretation of its Standard of Care Authority is Fatally Overinclusive. ........................................... 16

6.      The Clarity of the "Standard of Care" Is Irrelevant in A First Amendment Content/Viewpoint and Level of Scrutiny Analysis. ...........16

7.      Under California law, the Propriety of Information Provided by a Physician to a Patient Concerning a Proposed Treatment Is Not Reviewed under the Standard of Care but by the Reasonable Man Standard. ..........................................................................................17

C.      Information and Recommendations to Patients is Protected Speech and not Board Regulatable Conduct under All Applicable U.S. Appellate Court Authority ........................................................................................................17

1.      *Conant v. Walters*, 309 F.3d. 629 (9th Cir. 2002)....................................18

2.      *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), abrogated ("on other grounds") *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ...............................................................................................19

3.      *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) .......................................................................................................20

4.      *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ................................23

D.      Patients have a Constitutional Right to Receive Information Even If the Public Health Authorities Disagree with the Content and Viewpoint. ...............25

VI.     OTHER PRELIMINARY INJUNCTION FACTORS ARE PRESUMED OR ESTABLISHED IN THE RELATED CASES ................................................................26

VII.    REQUEST THAT NO BOND BE REQUIRED ...............................................................26

CONCLUSION .............................................................................................................27

LOCAL RULE 231 (D)(3) STATEMENT .........................................................................27

CERTIFICATE OF SERVICE .........................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*ACLU v. Ashcroft,*
    322 F.3d 240 (3rd Cir. 2003) ............................................................................... 8

*Am. Bev. Ass'n v. City & Cty. of San Francisco,*
    916 F.3d 749 (9th Cir. 2019) ............................................................................... 8

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ............................................................................. 8

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ............................................................................................. 8

*Bd. of Trs. of the Glazing Health & Welfare Trust v. Chambers,*
    941 F.3d 1195 (9th Cir. 2019) ............................................................................. 7

*Brown v. Entm't Merchants Ass'n,*
    564 U.S. 786 (2011) ........................................................................................... 15

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520, 113 S.Ct. 2217 (1993) ................................................................ 11

*City of Ladue v. Gilleo,*
    512 U.S. 43 (1994) ............................................................................................. 15

*Conant v. Walters,*
    309 F.3d. 629 (9th Cir. 2002) ...................................................................... 18, 25

*Dobbs v. Jackson Women's Health Org.,*
    597 U.S. 215 (2022) ........................................................................................... 23

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................................. 7

*FCC v. League of Women Voters,*
    468 U.S. 364, 104 S. Ct. 3106 (1984) ............................................................... 10

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023) ............................................................................... 7

*Florida Star v. B.J.F.*
    491 U.S. 524 (1989) ........................................................................................... 15

*Foti v. City of Menlo Park,*
   146 F.3d 629 (9th Cir. 1998) ........................................................................ 16

*Gonzalez v. O Centro Espirita Beneficent Uniao*
   *do Vegetal,* 546 U.S. 418 (2006)................................................................. 8

*Hoeg v. Newsom,*
   2:22-cv-01980 WBS AC, 2:22-cv-02147 WBS AC (E.D. Cal. Jan 25, 2023) ............ 1, 8, 16

*Jorgensen v. Cassiday,*
   320 F.3d 906 (9th Cir. 1997) ...................................................................... 26

*Matal v. Tam*
   137 S. Ct. 1744 (2017) ............................................................................. 11

*McCullen v. Coakley,*
   573 U.S. 464 (2014)................................................................................. 10

*Members of City Council v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ................................................................................ 16

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
   138 S. Ct. 2361 (2018) ........................................................................3, *passim*

*Nat'l Inst. Of Family & Life Advocates v. Harris,*
   839 F.3d 823 (9th Cir. 2016) ...................................................................... 21

*Nken v. Holder,*
   556 U.S. 418 (2009)................................................................................... 7

*Otto v. City of Boca Ratan,*
   981 F.3d 854 (11th Cir. 2020) .................................................................... 24

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n,*
   475 U.S. 1 (1986) ..................................................................................... 8

*Pickup v. Brown,*
   740 F.3d 1208 (9th Cir. 2014) ........................................................ 19, 20, 22, 23

*Planned Parenthood v. Casey*
   505 U.S. 833 (1992)................................................................................ 21

*Police Dept. of Chicago v. Mosely,*
   408 U.S. 92 (1972)................................................................................. 10

      Motion for Preliminary Injunction

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ............................................................................ 10, 24

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................. 10, 21, 22, 24

*Roman Catholic Diocese v. Cuomo,*
    141 S. Ct. 63 (2020) .................................................................................. 14

*Rosenberg v. Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................................................... 11

*S.O.C., Inc. v. County of Clark,*
    152 F.3d. 1136 (9th Cir. 1998) .................................................................. 7

*Scherr v. Volpe,*
    466 F.2d 1027 (7th Cir. 1972) ................................................................. 26

*South Bay Pentecostal Church v. Newsom,*
    141 S. Ct 716 (2021) .................................................................................. 11

*Temple Univ. v. White,*
    941 F.2d 201 (3d Cir. 1991) .................................................................... 26

*Thalheimer v. City of San Diego,*
    645 F.3d 1109 (9th Cir. 2011) ................................................................... 7

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ....................................................... 19, 23, 24

*United States v. Alvarez,*
    567 U.S. 709 (2012) ..................................................................................... 7

*United States v. Playboy Ent Grp. Inc.*
    529 U.S. 803 (2000) .................................................................................. 13

*United States v. Stevens,*
    559 U.S. 460 (2010) .................................................................................... 8

*United States v. Swisher,*
    811 F.3d 299 (9th Cir. 2016) (*en banc*) ................................................. 21

*Welch v. Brown,*
    907 F. Supp. 2d 1102 (E.D. Cal. 2012) .................................................. 19

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) ............................................................................... 11

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................... 7

**California Cases**

*Cobbs. v. Grant*
    8 Cal.3d 229 (1972) ............................................................................... 17

**United States Constitution**

Article III ................................................................................................. 8, 9
First Amendment ............................................................................... 2, *passim*
Fifth Amendment ...................................................................................... 16
Fourteenth Amendment ........................................................................... 10

**California Statutes**

Business & Professions Code
    § 2234 (c) ........................................................................................ 2, 3, 4, 16
    § 2270 ............................................................................................ 3, 4, 6, 9, 17

**Legislative Sources**

Senate Bill No. 1172 (2011-2012 Reg. Sess.) ............................................... 19, 20

**Internet Sources**

*COVID-19 Vaccination Coverage and Vaccine Confidence Among Adults*,
    CENTERS FOR DISEASE CONTROL AND PREVENTION,
    https://www.cdc.gov/vaccines/imz-
    managers/coverage/covidvaxview/interactive/adults.html ................................. 1

*COVID-19 Vaccination Coverage and Vaccine Confidence Among Children*,
    CENTERS FOR DISEASE CONTROL AND PREVENTION,
    https://www.cdc.gov/vaccines/imz-
    managers/coverage/covidvaxview/interactive/children.html ............................... 1

The Editorial Board, *Anthony Fauci Fesses Up*, Opinion, THE WALL STREET
    JOURNAL (Jan. 11, 2024), https://www.wsj.com/articles/anthony-fauci-covid-
    social-distancing-six-feet-rule-house-subcommittee-hearing-44289850 .............................. 1

Katy Grimes, *9th Circuit Judges 'Shocked' and 'Floored' by LAUSD's Ongoing Covid-19 Vaccine Mandate for Employees*, CALIFORNIA GLOBE (Sept. 16, 2023), https://californiaglobe.com/fr/9th-circuit-judges-shocked-and-floored-by-lausds-ongoing-covid-19-vaccine-mandate-for-employees/ ............................................ 2

**Publications**

Robert F. Kennedy, Jr., *The Real Anthony Fauci* (Skyhorse Publishing, 2021) .................... 1

William H. Rehnquist, *The Supreme Court* (1987) ................................................................ 13

Motion for Preliminary Injunction

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION AND SUMMARY OF ARGUMENT**

It is now almost four years since the start of the pandemic, and ten months after the pandemic was declared over by President Biden. And yet, the Defendants are still fixated on prosecuting physicians for providing information to patients at odds with the public health authorities' Covid edicts. They continue to actively propagandize about the dire need for the latest Covid booster. But the public is not buying it.  According to the CDC's latest figures, only 17% of adults and 7% of children are Covid booster current for 2023-24.[1]

There is no evidence that the public's skepticism about boosters (and much of what the public health authorities have been saying over the past four years)[2] is caused by what California physicians are telling their patients. Rather, it is because of the ever-changing edicts have not proven out, which has resulted in their continuous apologies and promises to do better. (See the Complaint at page 19 footnote 12) for a sample of these *mea culpas*/promises.

Plaintiffs have filed this lawsuit as a follow-up to the lawsuits between most of the parties in *Hoang v. Bonta* and *Hoeg v. Newsom*. Like the preliminary injunction motion in those two cases, Plaintiffs seek a preliminary injunction to stop the California medical boards from prosecuting physicians for providing their patients with information, recommendations, and advice about Covid which is at odds with the messaging put out by the public health

---

[1] *See* Expert Declaration of Sanjay Verma, M.D. ("Dr. Verma Declaration"), paragraph 7, referring to *COVID-19 Vaccination Coverage and Vaccine Confidence Among Adults*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/vaccines/imz-managers/coverage/covidvaxview/interactive/adults.html and *COVID-19 Vaccination Coverage and Vaccine Confidence Among Children*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/vaccines/imz-managers/coverage/covidvaxview/interactive/children.html.

[2] Like the six-foot social distancing rule, which Dr. Fauci has recently admitted had no science behind it. *See* The Editorial Board, *Anthony Fauci Fesses Up*, Opinion, THE WALL STREET JOURNAL (Jan. 11, 2024), https://www.wsj.com/articles/anthony-fauci-covid-social-distancing-six-feet-rule-house-subcommittee-hearing-44289850 ("Anthony Fauci Fesses Up It turns out the six-feet social-distancing rule had no scientific basis.") *See also* co-counsel's book *The Real Anthony Fauci* ("*TRAF*"), with prescience of these matters, such as pages 6-10, by citing experts such as Plaintiff Dr. Kory.

1  authorities.[3]  The Plaintiffs and the people of California need the Court to step-in *again* and

2  stop the Defendants from continuing their misguided and as will be demonstrated hereinafter,

3  dangerous efforts.

4        This new case shares a critical similarity with its two related cases: the speech the

5  Defendants are seeking to restrict is the same, namely speech which is not in accordance with

6  the mainstream Covid narrative. Thus, in First Amendment parlance, in all three cases, the

7  Defendants seek to restrict both the content and viewpoint of what physicians tell their

8  patients. This makes the Defendants' plan and actions presumptively unconstitutional and

9  subject to strict scrutiny under standard First Amendment analysis.[4]

10       The Defendants cannot satisfy their heavy burden of proof under strict scrutiny. First,

11  whatever compelling state interest the government claimed (to suppress protected speech of

12  dissenting Covid opinions) has become outright embarrassing with the end of the pandemic.

13  Second, there is no record or evidence presented by or to the Defendants that targeting

14  California physicians for information they give to patients about Covid is narrowly tailored or

15  the least restrictive means, or that other means were considered and found lacking. That should

16  spell the end of the Defendants' present and future attempts to investigate, prosecute or

17  sanction physicians for providing information, advice, and recommendations about Covid

18  which is critical of the public health narrative or their future edicts.

19

20

---

21  [3] Recently, several Ninth Circuit judges called the Los Angeles School district's rule requiring
22  teachers have at least the original covid shots irrational *inter alia* because the public health
23  officials urged original shots geared to an earlier and no longer present strain of Covid, which
   was ineffective on its face. *See, e.g*., Katy Grimes, *9th Circuit Judges 'Shocked' and 'Floored'*
24  *by LAUSD's Ongoing Covid-19 Vaccine Mandate for Employees*, CALIFORNIA GLOBE (Sept.
   16, 2023), https://californiaglobe.com/fr/9th-circuit-judges-shocked-and-floored-by-lausds-
25  ongoing-covid-19-vaccine-mandate-for-employees/.

26  [4] As demonstrated below in sections V B 5 and 6, it matters not a whit that Defendants'
27  renewed attack on physicians' protected speech is based on a general/neutral statute because
   they are interpreting the statute to apply to fully protected speech with renders their actions
28  unconstitutional, and renders the statute (§ 2234, subd. (c) of the Business & Professions Code)
   unconstitutionally overbroad.

Finally, like the Supreme Court did in *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), this Court should reject the Defendants' attempt to create a new category of professional speech as unworthy of constitutional protection. The *NIFLA* court specifically rejected the type of definitional slight-of-hand of characterizing all speech between a physician and patients as medical/patient care, and so should this Court.

## II.   STATEMENT OF FACTS

### A.   Overlapping Parties and the Same Targeted Speech is Involved in all Three Lawsuits

This lawsuit has three of the same plaintiffs as in *Hoang*, and the same core Defendants as in *Hoang* and *Hoeg*. This case adds two medical doctors as Plaintiffs.  As the related cases are still ongoing, including pending motions which involve the post injunction facts, many of the facts which give rise to this case are familiar to this Court.

The simple of it is that after this Court's preliminary injunction order and the frosty reception the Defendants received at the oral argument in the *McDonald* appeal, the Defendants and their legislative confreres made a tactical retreat by repealing the Covid misinformation law, Business and Professions Code[5] section 2270; the repeal being effective January 1, 2024. However, they let it be known to the public and their licensees that they never really needed Section 2270 to sanction physicians for Covid misinformation because they could do so under their statutory standard of care authority, Section 2234 (c). This public relations task was accomplished by two public actions.

The medical board filed an accusation against a medical doctor for Covid misinformation, but cited the Board's standard of care statutory authority. (§ 2234 (c).)  In December 2023, the doctor agreed to surrender her medical license based on the Covid misinformation. (Verified Complaint at page 17 para. 74, hereinafter the "Complaint"). This is direct, compelling, and First Amendment chilling evidence that the medical board intends to

---

[5] All further statutory references are to the California Business and Professions Code.

continue to prosecute physicians for the same or more speech targeted now repealed Section 2270.[6]

Second, in commenting about Section 2270's impending repeal, a representative of the law's sponsor said that the Board still had the statutory authority to sanction the same conduct as under the repealed law. (*Id*. at paras. 72-73). Absent compelling evidence to the contrary, the Court should conclude that Defendants claim the power to sanction physician speech based on the content and viewpoint of the speech, just as under the repealed statute.

**B.   Plaintiffs' Evidence**

Plaintiffs' core scientific/medical contention in this case is that there is no legitimate Covid standard of care, for the same reason there is no contemporary scientific consensus, which was the fulcrum point of the Court's preliminary injunction order in the related cases. Dr. Sanjay Verma (who submitted the primary declaration in *Hoang)*, asserts that most physicians and their organizations simply repeat the latest public health authorities' narrative about the issues on patients' minds relating to Covid, like the need for continued boosterings for personal benefit and benefit to others (i.e.*, transmission), the efficacy of the off-label treatment, and the continued need for masking. (*See* Dr. Verma Declaration at pages 2-3.)  His conclusion is that there is not an independent standard of care during these Covid times, any more than there is/was a contemporary scientific consensus.

Dr. Verma's core point is supported by his detailed, fully sourced discussion of the some of the major problems/misses in the public health narrative; specifically:

(1). The differing public health approaches to vaccines in other countries which supports the view that there is no contemporary scientific consensus or legitimate standard of

---

[6] Section 2270 was limited to physician communications with patients for the purpose of treatment or advice. The general standard of care contains no such limitations. The physician was accused of Covid misinformation in part based on the advice she gave concerning the patient's pregnant sister who was not a patient. Communications intended for a non-patient sister would not have been sanctionable under Section 2270, but apparently is under the Board's purported Section 2234 (c) authority. Therefore, the medical board appears to be exercising jurisdiction over more speech now than under the repealed law.

care, but rather different countries make quite different risk/benefit decisions about Covid vaccines.  (Dr. Verma Declaration at pages 4-6.)

(2) The increased risk of cardiac disorders such as myocarditis from the vaccines. (*Id*. at pages 6-16)

(2) The waning efficacy and risk of repeated vaccination. (*Id*. at pages 16-20)

(5) The efficacy of masking as a public health measure. (*Id*. at pages 20- 23)

(6) Use of off-label drugs. (*Id*. at pages 23- 27).

Based on all these studies and sources, and all the changing and contradictory edicts promoted by the public health authorities over the past four years, Dr. Verma comes to the same basic conclusion as this Court did in its prior injunction, but adapted to the current standard of care statutory basis for the restrictions of physician speech:

> I wish to stress that the purpose of this declaration is to support the Plaintiffs' contention that it is not correct to say that there is a true standard of care about almost all the important scientific issues related to SARS-Covi 2 virus. Many of the edicts put out by the public health authorities have had to be changed or abandoned because of new data. As the new edicts change, so do the recommendations of many physicians, but I believe that it is a misuse of the term to call what most physicians are telling patients to be an actual standard of care.  Of course, the standard of care can differ in different parts of the country and in different countries, but the divergence of views (as some of the key elements such as the need for continued boosters) shows that the so-called standard of care, at least in this country, is just opinion of public health authorities. Inconsistently, the opinions get promoted in various literature and media, which many physicians simply relate to their patients.

*Id*. at page 27.

All three individual physician plaintiffs concur with Dr. Verma's conclusions and think that the studies he relates in his declaration are important and depending on the individual patient, some of them might be worthy of mentioning in patient interactions.  (Kory declaration at pages 3-4, Hoang declaration at page 2 and Tyson declaration at page 2).

The physician plaintiffs make additional important points based on their experience treating Covid patients and Covid vaccinated patients, as well as pointing out some alarming facts.

Dr. Kory notes that even the media is starting to report concern over the alarming increase in death rates, which cannot be explained by the Covid virus itself. (Dr. Kory Declaration at page 3) Dr. Tyson, whose clinic has treated 20,000 Covid patients, states that his clinic has not seen Covid in patients' lungs in two years, meaning that the disease has largely morphed into something more akin to a head cold, at least when treated with some standard remedies like Z pack, Tylenol, and some nutritional supplements.  Disturbingly, Dr. Hoang notes that some of her Covid vaccinated patients are presenting with new immunologic and other problems, which seem to have additional consequences.  (Dr. Hoang declaration at pages 2-3).

Finally, because physician free speech is at its core about information to be conveyed to patients, it is important for the Court to hear the patients' perspective, as it did in the prior preliminary injunction motions. Debbie Hobel, who submitted a declaration in *Hoang*, submits a new declaration in this case. Apart from thanking the Court for protecting her right to receive information from Dr. Hoang and other physicians, she notes that she is back to square one because the medical boards announced a workaround from the injunction and the fact that Section 2270 has been repealed. She is going to wait until the Court decides this motion before seeking health care advice from any California physician about Covid.

Neil Selflinger explains that he had a severe reaction to his first mRNA shot. His physician ultimately recommended he take the second shot, even though he was still experiencing side effects many months after the first shot. He eventually found his way to Dr. Kory who did not push the vaccine, and recommended a treatment protocol that is mitigating his episodic side effects.

1  **III.   THE PRELIMINARY INJUNCTION STANDARD IN A FIRST AMENDMENT**
2        **CASE**

3        The standard four-part test to obtain a preliminary injunction is: 1) Likelihood of

4  success on the merits; 2) Irreparable injury in the absence of relief; 3) The balance of equities

5  tips in plaintiff's favor; and 4) Showing the public interest favors granting the injunction.

6  *Winter v. Natural Res. Def. Council, Inc.*,555 U.S. 7, 20 (2008); *Fellowship of Christian*

7  *Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,* 82 F.4th 664, 683-84 (9th Cir. 2023).[7]

8        However, in a First Amendment free speech preliminary injunction motion, the *Winter*

9  test is greatly relaxed and simplified because of the jurisprudential policy of protecting First

10 Amendment rights as quickly as possible. Arguably, a plaintiff only needs to prove a colorable

11 First Amendment violation or threatened violation. *Thalheimer v. City of San Diego*, 645 F.3d

12 1109 (9th Cir. 2011) *overruled on other grounds by Bd. of Trs. of the Glazing Health &*

13 *Welfare Trust v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019).

14       In a preliminary injunction case seeking to temporarily stop the enforcement of a likely

15 or colorable claim of unconstitutionality, the three latter preliminary injunction elements are

16 either presumed or carry less importance.  Thus, for irreparable injury, "'[t]he loss of First

17 Amendment freedoms, for even minimal periods of time, unquestionably constitutes

18 irreparable injury' for purposes of the issuance of a preliminary injunction." *Elrod v. Burns*,

19 427 U.S. 347, 373 (1976); *see also S.O.C., Inc. v. County of Clark*, 152 F.3d. 1136, 1148 (9th

20 Cir. 1998) (establishing "probable success on the merits" of a First Amendment claim itself

21 demonstrates irreparable harm).

22       Focusing on balancing the interests, the Supreme Court has expressed reluctance to

23 balance the equities when the government is attempting to suppress content-based speech. *See*

24 *United States v. Alvarez,* 567 U.S. 709, 717 (2012) ("In light of the substantial and expansive

25 threats to free expression posed by content-based restrictions, this court has rejected as

26

27 _____

28 [7] When the State is the defendant, the last two factors merge (balance of equities and public
interest merge as the government's interest is the public interest. *Nken v. Holder*, 556 U.S. 418,
435 (2009).

'startling and dangerous' a 'free floating test for First Amendment coverage … [based on] an *ad hoc* balancing of relative social costs and benefits.'") quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010). *See also Am. Bev. Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). "Shifting the focus to the public's interest, there is no public "interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n. 11 (3rd Cir. 2003). "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 8 (1986).

On a more general level, if the First Amendment plaintiff shows likelihood of success on the merits, the speech is presumed to be protected, which means that the burden is on the defendant to show that the challenged government action satisfies heightened scrutiny, and that would include proof that less restrictive alternatives were considered and found to be less effective than the statutory solution, *Ashcroft v. ACLU,* 542 U.S. 656, 666 (2004). S*ee also Gonzalez v. O Centro Espirita Beneficent Uniao do Vegetal,* 546 U.S. 418, 429 (2006).

The takeaway is that in preliminary injunction motions involving content restrictions to free speech, the courts only primarily focus on the likelihood of success on the merits.  If there is, the irreparable injury is presumed/established and there is no balancing of interests. As this Court has quoted: "[B]y establishing a likelihood that [the challenged law] violates the U.S. Constitution, [p]laintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). *Hoeg v. Newsom*, 2:22-cv-01980 WBS AC, 2:22-cv-02147 WBS AC, page 29 (E.D. Cal. Jan 25, 2023).

## IV. PLAINTIFFS' ARTICLE III STANDING

Plaintiffs' Article III standing is an easy lift for two seemingly compelling reasons. First and most importantly, this Court has already determined that three of the five Plaintiffs in this case had standing to bring a pre-enforcement case against AB 2098. (*Id*. at pages 6-14). And, as shown above, both this and the two related AB 2098 cases challenge the Defendants' attempt to restrict the same protected speech. As indicated, the only difference between these

cases is the Defendants' asserted statutory basis of the First Amendment government infringement.

The standing allegations of the three Plaintiffs in this case (Complaint page 7, para. 23 to page 8, para 27 for Hoang, page 9 para. 37 to page 12 para. 47 for PIC and page 12 para. 48 to page 13 para. 53 for CHD) are substantially identical to those made in the *Hoang* case, referenced in the Court's preliminary injunction order (page 8-13 for Hoang, and pages 13-14 for the two common organizational Plaintiffs.[8]

The two additional medical doctor plaintiffs present the same concerns as did/do the three common Plaintiffs in this case and *Hoang*. Plaintiff Pierre Kory is a critical care physician with extensive experience in treating Covid patients. He, and the organization he co-founded, (Front Line Critical Care Alliance ("FLCCC")) are well known for their use and advocacy of Ivermectin and other off label drugs and his group's physicians' have successfully treated over 5,000 Covid patients. (Complaint at page 4, paras. 13 to page 5, para. 15) Patients come to him because of this knowledge and expertise and that makes him a potential target of the medical board.

Plaintiff Brian Tyson is also a potential target since he also provides advice and treatment which is or may not be in accordance with the public health authorities' Covid edicts, because he recommends off-label Covid treatments and against continued vaccination, and has co-written a book about his successful treatment protocol.

Second, the standing argument is even stronger in this case than in the related cases. This is not exactly a pre-enforcement case because the Board has already sanctioned one doctor for providing information contrary to mainstream Covid narrative. And, as pointed out, the AB 2098 sponsor's representative has directly stated that despite Section 2270's repeal, the medical boards can still sanction the same physician speech. (Complaint at page 17, para 73). Accordingly, for the reasons set forth in the Court's January 23, 2023 preliminary injunction order, it should find that the Plaintiffs have satisfied their article III standing requirements.

---

[8] This case lists CHD national, whereas in *Hoang,* the California chapter was listed as a plaintiff, but that difference has no legal significance for the standing analysis.

**ARGUMENT**

**V.     PLAINTIFFS CAN DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THE FIRST AMENDMENT FREE SPEECH CLAIM.**

The First Amendment provides in relevant part: "Congress shall make no law... abridging the freedom of speech." The First Amendment applies to actions by state agencies like the Board via the Fourteenth Amendment. The First Amendment's purpose is "to preserve an uninhibited marketplace of ideas in which the truth will ultimately prevail." *FCC v. League of Women Voters*, 468 U.S. 364, 377, 104 S. Ct. 3106, 3116 (1984). It is a "guiding First Amendment principal that the government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) *quoting Police Dept. of Chicago v. Mosely,* 408 U.S. 92, 95 (1972).

**A.     Under General First Amendment Principles the Defendants' Present and Future Attempts to Sanction Physicians for their Speech to Patients Based on Covid Content and Viewpoint is Subject to Strict Scrutiny.**

Any attempt by the Defendants to sanction physicians based on the subject to Covid would make their action content based.[9] Content based government restrictions to speech are adjudged under strict scrutiny, *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015), and are presumptive invalid. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 392 (1992) ("If First Amendment free speech means anything, it means that "the majority preferences must be expressed in some fashion other than silencing speech based on its content.").

The Defendants' restrictions to and threats against the speech of physicians is viewpoint based, that being the viewpoint which challenges the core tenants of the Covid public health narrative, such as everyone should take every available covid booster, and should only receive FDA on label drugs for the virus.  Viewpoint based restrictions is "an egregious form of

---

[9] A reliable way to determine whether the government's restriction of free speech is content-based is to ask whether the enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated. *Mc Cullen v. Coakley,* 573 U.S. 464, 479 (2014).

content discrimination," "presumptively unconstitutional" and subject to strict scrutiny. *Rosenberg v. Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995); *see also Matal v. Tam* 137 S. Ct. 1744, 1763 (2017).

Accordingly, under standard and required First Amendment speech analysis, the Defendants' planned actions prosecuting physicians for the Covid related speech to patients which is not consistent with the public health narrative is presumptively unconstitutional and should be adjudged under strict scrutiny.

## B.   The Defendants' Actions Fail Under Strict Scrutiny

Since this case involves a fundamental right, strict scrutiny means that the Defendants must *prove* a compelling state interest, and they also must *prove* that the means chosen were narrowly tailored such that the least restrictive means possible were used.  *South Bay Pentecostal Church v. Newsom,* 141 S. Ct 716, 718-19 (2021);[10] *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015).

### 1.   What is the Compelling State Interest to Restrict Physician Free Speech after Four Years of Many Wrong Covid Edicts and Failed Policies and Treatment Recommendations?

We are now four years since the start of the pandemic which was declared over by the President almost a year ago. So, what is the compelling state interest in sanctioning physicians for providing information which is not consistent with the mainstream Covid narrative?  It is

---

[10] "In cases implicating this form of 'strict scrutiny,' courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course, we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217 (1993). Even in times of crisis—perhaps especially in times of crisis—we have a duty to hold governments to the Constitution." *South Bay Pentecostal,* 141 S. Ct. at 718.

11                                    Motion for Preliminary Injunction

1    not like the public health authorities and the mainstream physician groups have had a clear and

2    consistent public and personal health message over these four years.

3      As the Court noted in the last injunction hearing, "First Fauci said you didn't need to

4    wear a mask, then he told everyone to wear two masks." Indeed, there were also scattered

5    edicts to wear a mask while standing inside a restaurant but not sitting. The public health

6    authorities also told everyone that the vaccines would prevent infection and transmission,

7    which turned out to be untrue. Originally the full dose (two shots of the mRNA vaccines) was

8    supposed to be sufficient, until they were not because of the evolving variants. Then people

9    needed a booster, then another because of their waning efficacy all while successive variants

10   have become less lethal. (See Dr. Tyson Declaration at page 2 and Dr. Verma declaration at

11   pages 19-23).

12     What is the compelling public interest in sanctioning a physician for not recommending

13   the second shot to a patient who had a severe and ongoing adverse reaction to the first shot?

14   (See the Declaration of patient Neil Selflinger; *See also* the declaration of patient Debbie

15   Hobel). What is the compelling state interest in denying physicians the right to tell patients

16   about their experience with Covid related issues, like the efficacy and side effects of the

17   vaccines and on and off label treatments, based on their clinical and their colleagues clinical

18   experience? There are not even long-term studies yet; so, what is driving the state interest?

19     We would submit that whatever compelling state interest there might have been early on

20   and when Covid was officially a pandemic, has long since ended because of the formal

21   termination of the pandemic, in conjunction with the fact that the newer variants are much less

22   lethal to healthy people. Note also the unethical practice of government trying to play 'greatest

23   good' by using censorship to conceal from young people their actual risk of injury, thereby

24   incentivizing vaccination that authorities falsely promised would "protect the elderly," as

25   discussed in the expert declaration of cardiologist Dr. Verma, pages 15-16, paragraph 38:

26   ("In my own practice, I have several young adults who chose to be vaccinated against COVID-

27   19 "to protect the elderly" (older more vulnerable family members) who subsequently

28   developed vaccine associated myocarditis and cardiomyopathy. If the general populace were

Motion for Preliminary Injunction

permitted to have a more genuine and comprehensive risk-benefit analysis (i.e., engage in informed consent) many of these cases of myocarditis might have been prevented. Children, who are otherwise at very low risk for hospitalization and death from COVID-19 should never have been subjected to COVID-19 vaccine mandates 'to protect the vulnerable' elderly and teachers (since they do not prevent transmission to others").

These are the types of injuries that arise daily in California from First Amendment violations, and they must be stopped as soon as possible by this Court.

> **2.      Defendants Cannot Meet Their Heavy Burden To Prove That Other Less Restrictive Means Were Considered and Rejected by Necessity.**

In *Hoang/Hoeg*, the government offered its best evidence that censorship is the only tool available to the government to accomplish health. That evidence was the ironic opinion of State experts saying that misinformation (which these State experts inadvertently purveyed themselves during the pandemic) injures people. Conspicuously absent from the government's ironic opinion was any evidentiary showing, let alone a strong evidentiary showing, needed to meet the government's high burden of proof on narrow tailoring.

Strict scrutiny requires the government provide evidence that other alternatives that do not involve restricting protected speech would not have been effective to achieve the compelling state interest. *See United States v. Playboy Ent. Grp. Inc*. 529 U.S. 803, 817 (2000). Where is the evidence that suppressing dissenting views about Covid is a compelling state interest? Whatever compelling interest might have been claimed early on is surely beyond claim now that the pandemic is declared over.[11] Furthermore, consider how often the public

---

[11] In his book, *The Supreme Court* (1987), former Chief Justice Rehnquist explained that a common theme for the judiciary is to defer to the Executive and Legislative branches during emergencies, and then after the emergency is finished the judiciary writes apologetics for how it *could have* better protected individual rights, offering light promises to do better next time. Justice Rehnquist found this pattern troubling, as judges today also rightly find it troubling. That is why it is so refreshing to see courts proactively stand up for individual rights during an emergency. Indeed, in 2020, Justice Gorsuch wrote famously these same sentiments when the government was trying to violate the First Amendment by shutting down churches yet allowing

health authorities have been wrong about or contradicted themselves. (See the Declaration of Sanjay Verma, M.D., and the Verified Complaint at page 19 footnote 12 for all the times the CDC has apologized to the public and promised to do better).

Where is the evidence that other methods, including allowing patients to receive dissenting information about the need for each successive booster would not have been effective? Perhaps greater transparency and honesty about the potential dangers of the vaccines, rather than all the efforts at vaccine-injury denialism, might also be a better solution.

Furthermore, because the pandemic ended a year ago, any relevant evidence which purports to show that other less restrictive measures were considered and rejected would have to have taken place after the declared end of the pandemic in April 2023, because, *inter alia,* the need has changed.

---

liquor stores to remain open: "Why have some mistaken this Court's modest decision in *Jacobson* for a towering authority that overshadows the Constitution during a pandemic? In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 71 (2020) (concurrence).

*See also* Dr. Verma Declaration, pages 3-4, paragraph 9, "From the practicing physicians' point of view, in a time of rapidly evolving public health situations, without the benefit of long-term studies and long-term epidemiological data, public health expert recommendations are often erroneous and ephemeral (changing before the recommendations can even be fully understood and adopted by practicing physicians and public). Public health authorities' edicts have repeatedly (and tragically) lagged many months behind valid scientific concerns raised by scientists and practicing physicians. This has led to a *de facto* rejection of any notion of *standard of* care on almost all aspects of the COVID-19 both by the public and by practicing physicians who have undertaken a deep, comprehensive analysis of the epidemiological data. In all other aspects of clinical medicine, *standard of care* is developed *and sustained* for years; it withstands the scrutiny of repeated published scientific studies over time. For scientists, practicing physicians and the general population, whimsical and ephemeral scientific consensus of public health experts and standard of care regarding COVID-19 issues cannot be materially distinguished."

### 3. Defendants Cannot Meet Their Heavy Burden to Prove That Restricting California Physicians' Free Speech Is Necessary to Achieve the Compelling State Interest.

Let us look at Defendants' strict scrutiny burden through the lens of *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011), wherein the Supreme Court stated that to satisfy strict scrutiny "[the] State must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be necessary to the solution." The *Brown* court said that under strict scrutiny the state "bears the risk of uncertainty" and "ambiguous proof will not suffice," as well as a "direct causal link" between the targeted information and the harm. *Id*.

Where is the actual evidence that restricting the protected speech of California physicians to their patients (or to the public if that is also what Defendants intend to do) will increase the percentage of the population who would agree to take each additional Covid booster? Four years later, and now after the pandemic, what is the evidence that there is a compelling state interest that it is vital for every person to take this and each successive Covid booster shot? We submit there is no longer a compelling state interest in at least large swaths of the public health narrative, the enforcement of which is the purpose of prosecuting physicians for providing information and advice against this edict.

### 4. The Defendants' Policy/Interpretation of Its Standard of Care Authority Is Fatally Underinclusive.

In addition to a failure of proof of causation, *Brown* suggests another reason why the Defendants asserted authority to reach protected speech fails, and that is the fatal under inclusiveness of the statute "when judged against its asserted justification. Under inclusiveness raises serious doubts about whether the government is in fact pursuing the interests it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchants Ass'n*, 564 U.S. at 802, *citing City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) and *Florida Star v. B.J.F.* 491 U.S. 524, 540 (1989).

The Defendants' policy of prosecuting physicians is, in the parlance of *Brown*, "wildly underinclusive" in several critical respects. The law only applies to physicians. It does not

include other licensed (and unlicensed) health care practitioners like chiropractors, or licensed or unlicensed naturopathic doctors.[12] Hence, there is strong evidence that the law is unconstitutionally underinclusive and is not a reasonable fit under heightened scrutiny. Finally, it may or may not apply to the soapbox speech. If it does, that just adds another layer of unconstitutionality. If it does not, that strengthens the under-inclusivity problem.

### 5.   The Defendants' Policy/Interpretation of its Standard of Care Authority is Fatally Overinclusive.

Assuming arguendo that as a matter of statutory construction, the Defendants' interpretation of their standard of care statutory authority (Bus. & Prof. Code, § 2234, subd. (c)) reaches physicians' protected speech, that would render the statute facially unconstitutionally overbroad. *See Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir. 1998) (one kind of a facial challenge is if "it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad," *quoting Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796 (1984)). And that is exactly the problem as the Defendants' attempt to use a general and open-ended statutory term like "standard of care" and characterize all communications between physicians and patients as medical conduct, to reach protected speech.

### 6.   The Clarity of the "Standard of Care" Is Irrelevant in A First Amendment Content/Viewpoint and Level of Scrutiny Analysis.

We are mindful that the Court has stated on several occasions that "standard of care" has a clear meaning under California Law (*see Hoeg v. Newsom* at page 25).  Although the lack of clarity of an important term in a statute is highly relevant in a Fifth Amendment vagueness challenge, it is not relevant to a First Amendment challenge which focuses on a content and viewpoint analysis which determines the level of judicial scrutiny applied by the courts.

---

[12] Nor has the State even attempted to discipline its own employees or institutions overseeing what many describe as the worst public health governance failure of the modern era.

Moreover, although the statutory term "standard of care" might be clear in that it refers to what most knowledgeable and competent practitioners think, as demonstrated by the Declaration of Dr. Verma, in the case of Covid, most practitioners simply repeat the most recent edicts of the public health authorities, which time and again have turned out to be wrong. Therefore, respectfully, the Court may wish to reconsider the clarity of the term as applied to Covid, to the extent it determines the clarity of the term weighs against the requested preliminary injunction based on a First Amendment claim.

> **7.   Under California law, the Propriety of Information Provided by a Physician to a Patient Concerning a Proposed Treatment Is Not Reviewed under the Standard of Care but by the Reasonable Man Standard.**

It is black letter California law that for the purposes of evaluating informed consent for a proposed treatment, the courts use the reasonable man standard, not what the consensus of what physicians think should be disclosed a/k/the standard of care. *Cobbs. v. Grant*, 8 Cal.3d 229 (1972). *Cobbs* therefore suggests that the Board's intended use of its standard of care statute to sanction physicians for what is in effect lack of informed consent misses the mark since the standard of care is not the test for adjudging the appropriateness of such information.

> **C.   Information and Recommendations to Patients is Protected Speech and not Board Regulatable Conduct under All Applicable U.S. Appellate Court Authority**

We have been down this road before with *Hoang/ Hoeg* and the two other AB 2098 cases, so we know what is coming: Defendants claim all speech/communications by physicians to patients in a patient interaction is patient/medical care, hence conduct, which is adjudged under the rational relationship test, even if the speech does not delivery therapy. As demonstrated below, this position is contradicted by Ninth Circuit authority (and Eleventh Circuit authority) and more to the point, it is inconsistent with the Supreme Court's *NIFLA* decision. However, as this Court knows, despite all this precedent, District Court Judge Slaughter swallowed the Defendants' argument hook, line, and sinker. Unfortunately, due to the Defendants' tactical retreat in repealing Section 2270, the appeal of Judge Slaughter's

opinion is not likely to be decided. As in *Hoang*, a close review of the relevant case law will demonstrate the error of the Defendants' ways.

### 1.   *Conant v. Walters*, 309 F.3d. 629 (9th Cir. 2002)

Despite Defendants' protestations*, Conant* is the most on-point authority for the application of strict scrutiny to this case. *Conant* involved a challenge brought by physicians, a physician group, and a patient group to the Drug Enforcement Agency's (DEA) announced policy that it would investigate and deregister physicians for "recommending" medical marijuana to patients.[13]  This despite that California had passed a referendum allowing physicians to recommend it (but not prescribe).  Under federal law, the drug had no legitimate medical use and most doctors thought it had no medical benefit. (Marijuana was (and still is) listed as a Schedule 1 drug, which, means the drug has no nationally, scientifically recognized medical use.)

The Plaintiffs argued that physicians had a First Amendment free speech right to make the recommendation. The district court agreed, applied strict scrutiny, and granted a preliminary injunction. After trial, another district court judge issued a permanent injunction which was affirmed on appeal by the Ninth Circuit.

*Conant* distinguished the fully protected speech of a physician's "recommendation" of the drug from writing a prescription, which all parties conceded would not be protected by the First Amendment because it was professional conduct (and a violation of federal law).

*Conant* strongly supports the Plaintiffs' position in this case, as it is based on the difference between the fully protected speech of making a recommendation (or giving the physician's opinion) from potentially regulatable professional conduct (rational relationship

---

[13] It is worth emphasizing that *Conant* was not a challenge to a statute, but an announced policy, like the announced policy here that the medical boards still had the statutory authority and would exercise that authority to prosecute Covid misinformation purveyors despite the repeal of Section 2270.

1   test) of issuing prescriptions. Plaintiffs' First Amendment challenge involves the former and

2   not the latter.[14]

3              **2.      *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), abrogated ("on other**
                    **grounds")** ***Nat'l Inst. of Family & Life Advocates v. Becerra***, **138 S. Ct.**
4                   **2361 (2018)**

5

6          Although abrogated by *NIFLA,* a discussion of *Pickup* is both highly instructive and

7   necessary because despite *NIFLA'*s repudiation, *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir.

8   2022) has revived and followed *Pickup'*s holding. (Discussed in section 4 *infra*.).

9          *Pickup* involved two groups of mental health professionals who filed separate lawsuits

10  challenging the constitutionality of Senate Bill 1172 (2011-2012 Reg. Sess.), which made it a

11  board disciplinable offense to provide sexual orientation change therapy to minors. One district

12  court used strict scrutiny and issued a preliminary injunction against the law (*Welch v. Brown*,

13  907 F. Supp. 2d 1102 (E.D. Cal. 2012), The other district court denied the preliminary

14  injunction applying a rational relationship standard because the law targeted therapy which is

15  professional conduct, not speech, (i.e., facts and opinions about the therapy) and thus does not

16  call for heightened scrutiny.

17         On the combined appeal, the Ninth Circuit affirmed *Pickup's* denial of the preliminary

18  injunction and reversed this W*elch's* granting of a preliminary injunction. The *Pickup* panel

19  acknowledged its earlier decision in *Conant,* but held that more regulation is possible for

20  "conduct necessary to administer treatment itself." *Pickup*, 740 F.3d at 1227 (and that sounds

21  much like speech incidental to conduct).

22         The court also found that "a professional's speech to patients is somewhat diminished."

23  *Id*. at 1228. The *Pickup* panel viewed professional speech as on a "continuum." Fully protected

24  speech would encompass a physician's "soapbox" speech to the public. At the other end would

25  be professional speech which performs, in effect, double duty as professional conduct (like the

26  sexual orientation conversion therapy at issue in that case). In the middle was professional

27  _____

28  [14] As set out in the Complaint, page 3, including footnote 1, and in Dr. Hoang's Declaration,
    page 4 para. 16, there is no such thing as Covid treatment consisting solely of speech.

1    speech directed to a patient. That middle of the continuum received lesser protection than
2    soapbox speech, but more than professional speech which is conduct, (presumably
3    intermediate scrutiny).

4        The *Pickup* panel specifically stated that since the statute

5            regulates only treatment while leaving mental health practitioners
6            free to discuss and recommend, or recommend against, SOCE we
             conclude that any effect it may have on free speech interests is
7            incidental. Therefore, we hold that SB 1172 is subject to only
8            rational basis review and must be upheld if it bears a rational
             relationship to a legitimate government interest.
9

10   *Id*. at 1231.

11       To further explain its continuum professional speech approach, the *Pickup* court gave
12   other examples of less or unprotected professional speech, like the fact that physicians can be
13   held civilly liable for giving negligent advice or sanctioning professional conduct if there is
14   speech associated with and inseparable from the negligent conduct, or even giving bad advice
15   about quack medicine. *Id*. at 1228. These examples were meant to demonstrate the State's long
16   history of restricting professional speech, presumably to justify its ability to regulate protected
17   speech in support of the Ninth Circuit's view that professional speech directed towards patients
18   is not fully protected.

19       However, as stated above and demonstrated below, *Pickup* (or at least its professional
20   speech analysis and continuum framework) is no longer good law considering *NIFLA*.

21            **3.    *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)**

22       *NIFLA* is the leading and most recent Supreme Court precedent on professional speech.
23   A close reading shows where the *Pickup* and the *NIFLA* Ninth Circuit panel went wrong, and
24   how this Court can avoid those errors by applying strict scrutiny (as it did in *Welch*) to the
25   Defendants' attempts to prosecute physicians for their (non-treatment/therapy) speech to
26   patients.

27       The issue in *NIFLA* was the constitutionality of a California statute that required pro-life
28   pregnancy clinics to post notices to patients containing information about how the patients

Motion for Preliminary Injunction

could get publicly funded (i.e., free) women's health care, including abortions.

The plaintiffs were several affiliated pro-life pregnancy care clinics, the purpose and function of which was to talk pregnant women out of having an abortion and to provide pregnancy care.  Obviously, the last thing these clinics wanted to do was to be forced by the State to provide their patients with government-authored information about pregnant women's right and ability to obtain free abortions. The clinics sued to strike the law down under the First Amendment and argued that strict scrutiny applied.

The California district court refused to apply strict scrutiny and held, *inter alia*, that state mandated content notices were either professional conduct subject to the rational relationship test or professional speech subject to intermediate scrutiny, and that the law survived under both. As a result, the district court denied the requested preliminary injunction. (As set out in *Nat'l Inst. Of Family & Life Advocates v. Harris,* 839 F.3d 823, 832 (9th Cir. 2016) *rev. Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361. (2018)).

The Ninth Circuit affirmed. It found that the mandated notices were content based but refused to follow the Supreme Court's recently decided *Reed v. Town of Gilbert,* 576 U.S. at 163, wherein the Supreme Court held that content based First Amendment restrictions are presumptively unconstitutional and are adjudged under strict scrutiny.

The Ninth Circuit gave two reasons for not following *Reed's* mandate for strict scrutiny. First, it noted that it had already held that content-based restrictions do not always require strict scrutiny. *Nat'l Inst. Of Family & Life Advocates v. Harris,* 839 F.3d at 836-37, *citing United States v. Swisher*, 811 F.3d 299, 311-313 (9th Cir. 2016) (*en banc*). Second, it relied on the (now overruled) case *Planned Parenthood v. Casey*, 505 U.S. 833, 884 (1992) to claim the right of states to regulate the content of physicians' speech on abortion issues.

The *NIFLA* Circuit panel also extensively discussed *Pickup,* and consistent with that decision, held that the mandatory information about abortion in the challenged law was subject to intermediate scrutiny because it was physician speech directed to patients and thus fell in the middle of the *Pickup* "continuum."  *NIFLA,* 839 F.3d at 838-41. The court then held that the law survived *intermediate scrutiny* (*Id.* at 841-44), and accordingly, it affirmed the district

court's denial of the preliminary injunction.[15]

Admittedly the Ninth Circuit's *NIFLA* opinion (and *Pickup*) would require this Court to use intermediate scrutiny, but for the fact that the Supreme Court reversed and very specifically criticized *Pickup's* First Amendment analysis, as well as other parts of the Ninth Circuit's reasoning in its *NIFLA* opinion.

For example, per above, the Ninth Circuit decided that it did not have to apply *Reed v. Town of Gilbert*'s strict scrutiny/presumptively unconstitutional directive to the California statute even though it was content based.  So, how did the Supreme Court start its First Amendment analysis of the California statute? By citing *Reed v. Town of Gilbert,* and quoting the very language that the Ninth Circuit said it did not have to follow. *NIFLA*, 138 S. Ct. at 2371 (2018)

This is a direct rejection of the Ninth Circuit's position that strict scrutiny does not apply to content-based First Amendment restrictions in professional speech to patients. The Supreme Court has thus clearly stated that courts are not free to disregard *Reed v. Town of Gilbert* just because it involves physician speech to patients.

The Supreme Court explained that the reason strict scrutiny was not applied by the lower California courts (and courts in two other circuits) was because "Some Courts of Appeals have recognized 'professional speech' that is subject to different rules." *Id. citing, inter alia, Pickup v. Brown,* 740 F.3d at 1227-29. But "this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals. …  This Court's precedents do not permit governments to impose content-based restrictions without 'persuasive evidence. … of a long (if heretofore unrecognized) tradition' to that effect.'" (Citation omitted). *NIFLA,* 138 S. Ct. at 2371-72.[16]

---

[15] The case involved two kinds of pregnancy clinics which were analyzed differently, but that is not material to this analysis.

[16] The court did however acknowledge that speech uttered by professionals is less protected "in two circumstances—neither of which turned on the fact that professionals were speaking," *Id.* at 2372, those being commercial speech (i.e., advertising, which is accorded much less First

At the end of the day, however, the *NIFLA* Supreme Court did not specifically hold that strict scrutiny applied to compelled speech because it found that the statute failed even intermediate scrutiny. The *NIFLA* court did not completely foreclose the possibility that there might be some persuasive reason to treat professional speech as a unique category exempt from ordinary First Amendment principles. *NIFLA*, 138 S. Ct. at 2375. However, having reviewed the Ninth Circuit's opinion in *NIFLA,* and having considered (and rejected) *Pickup's* rationale and very detailed explanation, including historical support for treating physician speech differently from general content and viewpoint strict scrutiny, the Supreme Court remained unconvinced.

Therefore, the big takeaway from *NIFLA* is that for anything less than the *Reed* required strict scrutiny to apply to this case, the Defendants would have to make some argument about why physician  speech should be treated as a separate category of speech which is less than fully protected by strict scrutiny that had not already been made (and rejected) in *Pickup* or the Ninth Circuit's NIFLA decision.[17]  And again, there is the not-so-small jurisprudential fact that *Pickup*'s underpinning from *Casey* was expressly overturned by *Dobbs*.[18]  Accordingly, based on *NIFLA*, (and *Dobbs*), strict scrutiny should be should be the measure of the Defendants' actions and policy that they can sanction physicians for their viewpoint speech to patients about Covid.

### 4. *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022)

*Tingley* involved the same type of First Amendment challenge to a Washington sexual orientation conversion therapy prohibition for minors that was rejected by the Ninth Circuit in *Pickup v. Brown* for a California statute.  On the professional speech issue, the *Tingley* court

---

Amendment protection, whether or not the advertiser is a professional) and the regulation of "professional conduct, even though that conduct incidentally involves speech." *Id.* at 2372.

[17] And to reiterate once again, that would include *Pickup's* rationale for lesser heightened First Amendment protection because physicians can be held liable and sanctioned for negligent advice. *See Pickup v. Brown.* 740 F.3d at 1228, which as stated was considered and rejected by the Supreme Court in *NIFLA*.

[18]  *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

very narrowly read *NIFLA* as abrogating "only the part of *Pickup* relating to the professional speech doctrine, and not its central holding that California's conversion therapy was a regulation of conduct that incidentally burdened speech." *Id*. at 1077. The panel then held, "*Pickup* remains binding law and controls the outcome of this case." *Id*. As the court poetically said: "States do not lose the power to regulate the safety of medical treatment performed under the authority of a state license merely because those treatments are implemented through speech rather than through a scalpel." *Id*. at 1064.

While *Tingley's* overly narrow reading of *NIFLA* might be questionable, as well as its resulting reaffirmation of *Pickup* despite its being explicitly repudiated by *NIFLA*, at least the Ninth Circuit acknowledged that *Pickup's* professional speech doctrine had been abrogated by the Supreme Court in *NIFLA*. That abrogation includes (or should include) the Ninth Circuit's misguided idea in its *NIFLA* opinion that lower courts can choose to ignore *Reed v. Town of Gilbert's* (and *R.A.V. v. City of St. Paul's*) requirement that content-based restrictions are presumptively unconstitutional and require strict scrutiny.   While *Tingley* has some broad general dicta and physicians and their role in society, all *Tingley* has done practically in this field is restate the rule that when medical procedures are delivered by speech, rational relationship applies. Accordingly, Tingley does not offer support or justification for government sanction physician speech which does not deliver medical treatment or that all communications between a doctor and a patient are regulatable medical care.

In short, neither *Tingley*'s holding or ruling require this Court to apply anything other than strict scrutiny. *Tingley* is currently pending cert determination. Since it directly conflicts with *Otto v. City of Boca Ratan*, 981 F.3d 854 (11th Cir. 2020) and because it revived *Pickup* after *Pickup* had been expressly rejected/abrogated in *NIFLA*, Tingley is best viewed for now as limited to the facts of its case, conversion therapy treatment and hence has no relevance to this case.

Based on the above case analysis, the Defendants' present, and future attempts to sanction physicians for providing information critical to the public health authority's Covid narrative and edicts should be adjudged under strict scrutiny, and are accordingly,

Motion for Preliminary Injunction

presumptively unconstitutional.

> **D.  Patients have a Constitutional Right to Receive Information Even If the Public Health Authorities Disagree with the Content and Viewpoint.**

As the Ninth Circuit noted in *Conant*:

> It is well established that the right to hear — the right to receive information — is no less protected by the First Amendment than the right to speak. [Citations omitted.] Indeed, the right to hear and the right to speak are flip sides of the same coin. As Justice Brennan put it pithily, "It would be a barren marketplace of ideas that had only sellers and no buyers." [Citations omitted.} This does not mean, however, that the right to speak and the right to listen always carry the same weight when a court exercises its equitable discretion. In this case, for instance, it is perfectly clear that the harm to patients from being denied the right to receive candid medical advice is far greater than the harm to doctors from being unable to deliver such advice. While denial of the right to speak is never trivial, the simple fact is that if the injunction were denied, the doctors would be able to continue practicing medicine and go on with their lives more or less as before. It is far different for patients who suffer from horrible disabilities...

*Conant v. Walters*, 309 F.3d at 643-644 (9th Cir. 2002). The declarations of patients Debbie Hobel and Neil Selflinger show the same individual compelling need for information as the patients in *Conant.*

However, the need might even be greater in this case because the boards are trying to censor information relating to public health as well the health of the individual. Specifically at issue is the Plaintiff physicians' opinion regarding published information about Covid vaccines and boosters, which opinion is at variance with public health institutions such as the CDC and the California Department of Public Health (whose opinions echo each other to give the appearance of a standard, not of care but of speech). Patients do or certainly should have the right to hear opposing views from their physicians as they make their individual and public health decisions.

And to succinctly summarize the fundamental flaw in Defendants' conduct argument, when you drill down on in, they are proposing a physician *standard of speech*, not a standard of care, and that violates the First Amendment, period, full stop.

## VI.   OTHER PRELIMINARY INJUNCTION FACTORS ARE PRESUMED OR ESTABLISHED IN THE RELATED CASES

As set forth above (pages 6-7), after a First Amendment plaintiff establishes a likelihood of success on the merits, irreparable injury is presumed, the government has no interest in continuing to violate the First Amendment rights of citizens, and the balance of equities weigh in favor of stopping the constitutional infringement (and further still, as the Supreme Court suggested, there is no balancing or weighing of equities after a constitutional violation is demonstrated).

Beyond that, this Court has found these three factors to weigh in Plaintiffs favor in the related cases which involved most of the same parties, similar evidence, the same targeted speech. There are only two essential differences between this case and the related cases. First, the statutory basis of the free speech restrictions is different, but that should be irrelevant. Second, the pandemic is over, which makes Plaintiffs' case for preliminary injunctive relief even stronger.

## VII.   REQUEST THAT NO BOND BE REQUIRED

This case seeks to protect the First Amendment rights of physicians and their patients. The Defendants will suffer no monetary harm if the temporary relief is granted. See *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 1997). Plaintiffs have a strong likelihood of success on the merits, see *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972), and the "equities of potential hardships to the parties" weigh in favor of Plaintiffs. See *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991). Therefore, Plaintiffs request that no bond be required.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Motion for Preliminary Injunction be granted and that the Defendants be prohibited from investigating, prosecuting, or sanctioning any physician for information, recommendations or advice relating to Covid as set forth in detail in the Verified Complaint and the proposed order, pending final judgment.

Dated: February 10, 2024

Respectfully submitted,

RICHARD JAFFE, ESQ.
SBN 289362
428 J Street, 4th floor
Sacramento, California, 95814
Telephone: 916-492-6038
Facsimile:  713-626-9420
Email:  rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
P*ro hac vice* admitted
48 Dewitt Mills. Rd.
Hurley, NY 12433
Tel: 845-481-2622

Attorneys for Plaintiffs

## LOCAL RULE 231 (D)(3) STATEMENT

1.  Plaintiffs do not seek an evidentiary hearing.

Richard Jaffe, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I, Richard Jaffe affirm as follows:

1. I am an attorney at law admitted to practice in this court. I am not a party to this action and am over the age of 18. I am counsel of record for the Plaintiffs in this case. I submit this Certificate of Service under penalties of perjury.

2. This Motion and all the declarations are being served on the Defendants by ECF service.

_____

Richard Jaffe, Esq.

Motion for Preliminary Injunction