UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| PIERRE KORY, M.D., LE TRINH HOANG, D.O., BRIAN TYSON, M.D., PHYSICIANS FOR INFORMED CONSENT, a not-for-profit corporation, and CHILDREN'S HEALTH DEFENSE, a not-for-profit corporation,<br><br>                Plaintiffs,<br><br>        v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, REJI VARGHESE, in his official capacity as Executive Director of the Medical Board of California, and ERIKA CALDERON, in her official capacity as Executive Officer of the Osteopathic Medical Board of California,<br><br>                Defendants. | No. 2:24-cv-00001 WBS AC<br><br><br>MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

----oo0oo----

        Plaintiffs Pierre Kory, Le Trinh Hoang, Brian Tyson, Physicians for Informed Consent, and Children's Health Defense brought this § 1983 action against defendants Rob Bonta, in his

1

official capacity as Attorney General of California, and Reji Varghese and Erika Calderon, in their official capacity as Executive Director and Executive Officer of the Medical Board of California and the Osteopathic Medical Board of California, respectively (the "Boards").  (Docket No. 1.)  Plaintiffs Kory, Hoang, and Tyson are physicians licensed by the Boards.  The remaining two plaintiffs are organizations representing the interests of doctors and patients.

Plaintiffs challenge the constitutionality of the Boards' powers to discipline physicians under Cal. Bus. & Prof. Code § 2234 for conveying COVID-19-related information to their patients.

I.   Factual and Procedural Background

The court previously related this case to two cases that challenged the constitutionality of California's Assembly Bill ("AB") 2098: Høeg v. Newsom, 2:22-cv-1980 WBS AC, and Hoang v. Bonta, 2:22-cv-2147 WBS AC.  (Docket No. 5.)

AB 2098, then codified at Cal. Bus. & Prof. Code § 2270 but since repealed, took effect on January 1, 2023.  The statute provided that "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation . . . related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."  Cal. Bus. & Prof. Code § 2270(a) (repealed 2024).  The statute defined "misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."  Id. § 2270(b)(4).  The statute augmented

the definition of "unprofessional conduct," id. § 2270(a), which

is a pre-existing basis for disciplinary action by the Boards,

see id. § 2234.

This court preliminarily enjoined enforcement of AB

2098 against the Høeg and Hoang plaintiffs on January 25, 2023,

on the ground that the law was unconstitutionally vague under the

Fourteenth Amendment.  See Høeg v. Newsom, 652 F. Supp. 3d 1172

(E.D. Cal. 2023).

The California Legislature subsequently repealed AB

2098, effective January 1, 2024.  See Cal. Senate Bill 815 (Sept.

30, 2023).  Both the Ninth Circuit and this court determined that

the repeal of AB 2098 mooted actions challenging the statute.

See McDonald v. Lawson, 94 F.4th 864, 870 (9th Cir. 2024); Høeg,

2024 WL 1406591, at *1–2 (E.D. Cal. Apr. 2, 2024).  This court

therefore dismissed the Høeg and Hoang actions.  See id. at *3.

Plaintiffs filed this action, making similar First Amendment

arguments to those raised (but not addressed by the court) in the

Høeg and Hoang matters.  While the Høeg and Hoang matters

involved First and Fourteenth Amendment challenges to AB 2098,

the plaintiffs here bring a First Amendment challenge to the

Boards' longstanding authority to discipline doctors under

Business & Professions Code § 2234.

Plaintiffs now move for a preliminary injunction.

(Docket No. 14.)

III. Preliminary Injunction Standard

To succeed on a motion for a preliminary injunction,

plaintiffs must establish that (1) they are likely to succeed on

the merits; (2) they are likely to suffer irreparable harm in the

1  absence of preliminary relief; (3) the balance of equities tips

2  in their favor; and (4) an injunction is in the public interest.

3  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008);

4  Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 979 (9th Cir.

5  2011).  "[I]njunctive relief [i]s an extraordinary remedy that

6  may only be awarded upon a clear showing that the plaintiff is

7  entitled to such relief."  Winter, 555 U.S. at 22.

8  III.  Discussion

9        A.   Regulation of Physicians and the First Amendment

10            "[R]egulating the content of professionals' speech

11  'pose[s] the inherent risk that the Government seeks not to

12  advance a legitimate regulatory goal, but to suppress unpopular

13  ideas or information.'"  Nat'l Inst. of Fam. & Life Advocs. v.

14  Becerra, 585 U.S. 755, 771 (2018) ("NIFLA") (quoting Turner

15  Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 641 (1994)).

16  "[P]hysician speech is entitled to First Amendment protection

17  because of the significance of the doctor-patient relationship."

18  Conant v. Walters, 309 F.3d 629, 636 (9th Cir. 2002).  Physicians

19  "must be able to speak frankly and openly to patients," in part

20  because "barriers to full disclosure would impair diagnosis and

21  treatment."  Id.

22            However, under longstanding Supreme Court precedent,

23  "[s]tates may regulate professional conduct, even though that

24  conduct incidentally involves speech."  See NIFLA, 585 U.S. at

25  768; see also Sorrell v. IMS Health Inc., 564 U.S. 552, 567

26  (2011) ("the First Amendment does not prevent restrictions

27  directed at . . . conduct from imposing incidental burdens on

28  speech"); R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992)

4

1    ("words can in some circumstances violate laws directed not

2    against speech but against conduct").  "'[I]t has never been

3    deemed an abridgement of freedom of speech or press to make a

4    course of conduct illegal merely because the conduct was in part

5    initiated, evidenced, or carried out by means of language, either

6    spoken, written, or printed.'"  Nat'l Ass'n for Advancement of

7    Psychoanalysis v. Cal. Bd. of Psych., 228 F.3d 1043, 1053 (9th

8    Cir. 2000) ("NAAP") (quoting Giboney v. Empire Storage & Ice Co.,

9    336 U.S. 490, 502 (1949)).

10         Physician conduct is no exception to this rule.

11   Accordingly, the Supreme Court has explained that there is "no

12   constitutional infirmity" where a law "implicate[s]" a

13   physician's First Amendment rights "only as part of the practice

14   of medicine, [which is] subject to reasonable licensing and

15   regulation by the State."  See Planned Parenthood of Se. Pa. v.

16   Casey, 505 U.S. 833, 884 (1992), overruled on other grounds by

17   Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) (cited

18   with approval in NIFLA, 585 U.S. at 769-70).  "When a drug is

19   banned, for example, a doctor who treats patients with that drug

20   does not have a First Amendment right to speak the words

21   necessary to provide or administer the banned drug."  Pickup v.

22   Brown, 740 F.3d 1208, 1229 (9th Cir. 2014), abrogated on other

23   grounds by NIFLA, 585 U.S. 755.  Indeed, "[m]ost, if not all,

24   medical . . . treatments require speech, but that fact does not

25   give rise to a First Amendment claim."  Id.; see also Robert

26   Post, Informed Consent to Abortion: A First Amendment Analysis of

27   Compelled Physician Speech, 2007 U. Ill. L. Rev. 939, 950 (2007)

28   ("The practice of medicine, like all human behavior, transpires

through the medium of speech.  In regulating the practice,
therefore, the state must necessarily also regulate" the speech
of physicians.).

### 1.   Overview of Recent Cases

In Pickup, the Ninth Circuit analyzed the speech-
conduct distinction in a case challenging Washington's law
banning the practice of sexual orientation conversation therapy
on children.  The court stated that laws regulating the speech of
health care professionals could be placed along a "continuum."
See 740 F.3d at 1227.  "At one end of the continuum, where a
professional is engaged in a public dialogue, First Amendment
protection is at its greatest."  Id.  "At the other end of the
continuum . . . is the regulation of professional conduct, where
the state's power is great, even though such regulation may have
an incidental effect on speech."  Id. at 1229 (emphasis added).

"At the midpoint of the continuum, within the confines
of a professional relationship, First Amendment protection of a
professional's speech is somewhat diminished."  Id. at 1228.  As
such, the Ninth Circuit explained, in that midpoint category of
"professional speech," "the First Amendment tolerates a
substantial amount of speech regulation within the professional-
client relationship that it would not tolerate outside of it."
See id. at 1229.

Applying these principles to the Washington law, the
Pickup court concluded that the challenged law fell at the
"conduct" end of the spectrum because it regulated a "form of
treatment" and "[did] nothing to prevent licensed therapists from
discussed the pros and cons of [conversion therapy] with their

1   patients."  See id.  That "speech may be used to carry out"

2   conversion therapy "[did] not turn the regulation of conduct into

3   a regulation of speech."  Id.

4           Four years later, in NIFLA, the Supreme Court

5   considered a California law requiring so-called "crisis pregnancy

6   centers" to make certain compelled disclosures.  See 585 U.S. at

7   763-64.  In analyzing the constitutionality of the law, the NIFLA

8   court explicitly rejected Pickup's continuum approach and

9   delineation of "'professional speech' as a separate category of

10  speech that is subject to different rules."  See id. at 767.  The

11  Court stated that its "precedents do not recognize [a tradition

12  of allowing content-based restrictions] for a category called

13  'professional speech,'" but reiterated the longstanding rule --

14  relied upon by the Pickup court -- that "States may regulate

15  professional conduct, even though that conduct incidentally

16  involves speech."  See id. at 768.

17          In Tingley v. Ferguson, 47 F.4th 1055 (9th Cir. 2022),

18  cert. denied, 144 S. Ct. 33 (2023), the Ninth Circuit considered

19  a challenge to a California law banning conversion therapy that

20  was functionally identical to the one considered in Pickup.  The

21  case gave the Ninth Circuit occasion to consider what effect

22  NIFLA had on Pickup.  The court concluded that "NIFLA abrogated

23  only the 'professional speech' doctrine -- the part of Pickup in

24  which we determined that speech within the confines of a

25  professional relationship" (the "theoretical 'midpoint' of the

26  continuum") receives decreased scrutiny.  See id. at 1073, 1075.

27          However, the Tingley court determined that "the

28  conduct-versus-speech distinction from Pickup remains intact"

7

post-NIFLA.  See id. at 1055.  NIFLA therefore did not abrogate
Pickup's analysis of the Washington conversion therapy law, which
fell within the category of professional conduct.  See id. at
1077.

Following NIFLA and Tingley, then, a court's task in
analyzing a regulation of physicians under the First Amendment is
to determine whether the law at issue regulates physician speech,
in which case it is subject to strict scrutiny; or regulates
physician conduct, in which case it is not constitutionally
suspect and subject to rational basis review.  See NIFLA, 585
U.S. at 767; Tingley, 47 F.4th at 1072, 1078.

### 2.  Physician Conduct Versus Physician Speech

As a representative example, Dr. Kory avers that he
provides consultations during which he addresses patient
"questions and concerns" about ivermectin for the treatment of
COVID-19, including "whether he recommends its use."  (Verified
Compl. (Docket No. 9) ¶ 19.)[1]  Relying on Conant, plaintiffs
argue that this type of consultation is protected physician
speech.

In Conant, the Ninth Circuit addressed the
constitutionality of a federal policy of "investigating doctors
or initiating proceedings against doctors only because they
'recommend' the use of marijuana."  309 F.3d at 634.  This policy
was grounded in marijuana's classification as a controlled
substance, which barred doctors from prescribing marijuana in any

---

[1]    While plaintiffs make numerous contentions concerning
the efficacy of ivermectin in treating COVID-19, the court's task
here is not to determine the legitimacy of any medical treatment.

circumstance.  See id. at 632-34.  The Ninth Circuit concluded that the policy violated the First Amendment because it "punish[ed] physicians on the basis of the content of doctor-patient communications."  See id. at 637.

In coming to this conclusion, the Ninth Circuit pointed out the distinction between a "recommendation" untethered from treatment of a patient, and a "recommendation [that] the physician intends for the patient to use . . . as the means for obtaining marijuana."  See id. at 635.  The former is speech, while the latter is regulable conduct -- akin to a doctor's "prescription" of a drug -- that could lead to criminal liability for aiding and abetting the patient's violation of federal law. See id. at 635-36.  As the Pickup court explained, Conant indicates that "doctor-patient communications about medical treatment receive substantial First Amendment protection, [while] the government has more leeway to regulate the conduct necessary to administering treatment itself."  See 740 F.3d at 1227.

It was not, as plaintiffs seem to suggest, the use of the word "recommendation" that was dispositive in Conant.  If that were the case, doctors could frame their treatment as "recommendations" to shield themselves from regulation.  Instead, it was the relationship of the doctors' marijuana recommendation to treatment that mattered.  See Conant, 309 F.3d at 635-36; Pickup, 740 F.3d at 1227; see also Rumsfeld v. F. for Acad. and Inst. Rights, Inc., 547 U.S. 47, 66 (2006) ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

9

It is important to note the specific context presented by Conant where, by legal necessity, any physician's "recommendation" of marijuana was entirely disconnected from the physician's treatment of the patients.  This is because to treat a patient with marijuana was illegal and would have subjected the physician to criminal liability (which the parties agreed was not constitutionally problematic).  See 309 F.3d at 634-35; see also Pickup, 740 F.3d at 1229 (explaining that the policy at issue in Conant "prohibited speech wholly apart from the actual provision of treatment") (emphasis in original).  Thus, in Conant, it was simple for the Ninth Circuit to create a clear "demarcation between conduct and speech."  See Pickup, 740 F.3d at 1226 (citing Conant, 309 F.3d at 632, 635-36); see also Conant, 309 F.3d at 635 (indicating that the injunction upheld on review drew a "clear line between protected medical speech and illegal conduct").

Most situations in medical practice are not so clear-cut.  Within the same patient conversation, a doctor could go from (1) speaking about his views on a particular treatment based on his experience and expertise, to (2) prescribing the use of that treatment for the patient's care.  The former would be speech, while the latter would be conduct.  This is because the "key component" of a doctor's prescription of a drug is the provision of the drug, not the speech itself.  See NAAP, 228 F.3d at 1054.  And "the First Amendment does not prevent a state from regulating treatment even when that treatment is performed through speech alone."  Pickup, 740 F.3d at 1230.  Thus, when a doctor speaks in his capacity as the patient's treating physician

and incident to his provision of medical care, the physician's words constitute regulable conduct.

Returning to the situation posed by Dr. Kory, his discussion with a patient of the "pros and cons" of ivermectin and a statement that he generally recommends the use of that treatment for COVID-19 could be considered speech. See Conant, 309 F.3d at 634; see also Pickup, 740 F.3d at 1229 (law banning conversion therapy was constitutional in part because it "allow[ed] discussions about treatment, recommendations to obtain treatment, and expressions of opinions about" treatment). If Dr. Kory were to prescribe the medication, instruct the patient to take the medication, or otherwise use words to treat the patient -- for example by saying, "I recommend that you take 10 milligrams of ivermectin once a day for seven days" -- Dr. Kory's words could constitute conduct regulable by the state, as his speech was incident to his treatment of the patient.[2] Cf. Conant, 309 F.3d at 635-36 (indicating that when a "physician intends for the patient to use [his recommendation] as the means for obtaining" an illegal drug, the recommendation of the drug can be considered criminal conduct).

The court recognizes that the distinction between physician speech and conduct may be subtle at times. Nonetheless, "[w]hile drawing the line between speech and conduct can be difficult, [the Supreme Court's] precedents have long

---

[2]   The court again emphasizes that it takes no position on the propriety of using ivermectin to treat COVID-19.  It only concludes that, in the example raised by plaintiffs, treating a patient with ivermectin falls within the bounds of "conduct" that the state may permissibly regulate.

drawn it."  NIFLA, 585 U.S. at 769.

      B.   Section 2234(c) Is a Facially Constitutional Regulation of Physician Conduct

California Business & Professions Code § 2234 grants the Boards authority to "take action against any licensee who is charged with unprofessional conduct."  Unprofessional conduct includes, but is not limited to, incompetence, gross negligence, and repeated negligent acts.  Id.  Plaintiffs seek to enjoin enforcement of section 2234(c) pertaining to "repeated negligent acts," which are defined as "[a]n initial negligent act or omission followed by a separate and distinct departure from the applicable standard of care."  Id. § 2234(c).[3]  Plaintiffs argue that the Boards will impermissibly use section 2234(c) to discipline physicians for constitutionally protected doctor-patient communications concerning COVID-19.

The statute is neutral on its face and applies broadly to the practice of medicine by all doctors.  It does not discriminate between different types of content or speakers and is therefore not a content-based regulation requiring the application of strict scrutiny.  See NIFLA, 585 U.S. at 766 (content-based regulations are those that "target speech based on its communicative content"); see also NAAP, 228 F.3d at 1055

---

[3]    Plaintiffs state that they seek to enjoin the entirety of section 2234.  However, their arguments appear only to address section 2234(c), and plaintiffs' counsel admits that he "has not identified any other provision of the Business and Professions Code which could be utilized by the board as an alternative" basis for discipline.  (See Docket No. 18 at 10.)  The court therefore construes plaintiffs' motion as a challenge to section 2234(c).

1   ("California's [psychoanalyst] licensing scheme is content and

2   viewpoint neutral; therefore, it does not trigger strict

3   scrutiny.").

4          Further, the plain language of the statute -- which

5   uses the terms "unprofessional conduct" and "act or omission" --

6   clearly contemplates disciplinary action for conduct, not speech.

7   The statute's reference to the standard of care makes this plain

8   as, by its very nature, the standard of care applies to care, not

9   speech.  See Alef v. Alta Bates Hosp., 5 Cal. App. 4th 208, 215

10  (1st Dist. 1992) (the standard of care determines "the minimum

11  level of care to which the patient is entitled") (emphasis

12  added).  The statute is therefore a regulation of professional

13  conduct with only an incidental effect on speech, if any.  See

14  NIFLA, 585 U.S. at 768; Casey, 505 U.S. at 884.

15         Because section 2234(c) regulates conduct, it need only

16  satisfy rational basis review.  See Tingley, 47 F.4th at 1078.

17  Under this standard, a law need only be "rationally related to a

18  legitimate state interest" to pass constitutional muster.  See

19  id.  Section 2234(c) easily satisfies that standard.

20         A state has "a 'compelling interest in the practice of

21  professions within [its] boundaries.'"  Tingley, 47 F.4th at 1078

22  (quoting Goldfarb v. Va. State Bar, 421 U.S. 773, 792 (1975)).  A

23  state also has an interest in regulating health care providers to

24  protect patient health and safety.  See Gonzales v. Carhart, 550

25  U.S. 124, 166 (2007); NAAP, 228 F.3d at 1054.  The requirement

26  that doctors provide appropriate care is plainly related to

27  advancing those interests.

28         Indeed, as the Supreme Court has explained:

> It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there.  It is a vital part of a state's police power.  The state's discretion in that field extends naturally to the regulation of all professions concerned with health . . . .  It is equally clear that a state's legitimate concern for maintaining high standards of professional conduct extends beyond initial licensing.  Without continuing supervision, initial examinations afford little protection.

Barsky v. Bd. of Regents of Univ. of State of N.Y., 347 U.S. 442, 451 (1954).  Accordingly, state "health and welfare laws" are "entitled to a 'strong presumption of validity.'"  See Dobbs, 597 U.S. at 301 (quoting Heller v. Doe, 509 U.S. 312, 319 (1993)); see also Conant, 309 F.3d at 639 (federal courts should respect the "principles of federalism that have left states as the primary regulators of [health professionals'] conduct"); NAAP, 228 F.3d at 1054 (citing Watson v. Maryland, 218 U.S. 173, 176 (1910)) ("It is properly within the state's police power to regulate and license professions, especially when public health concerns are affected.").

For the foregoing reasons, the court concludes that section 2234(c) is a facially constitutional regulation of physician conduct.

C.   Plaintiffs' Have Not Established Standing to Bring an As-Applied Challenge to Board Enforcement

Because section 2234(c) is a regulation of physician conduct, Board discipline of protected speech would be, by definition, outside the scope of 2234(c).  To obtain an injunction, plaintiffs would therefore need to mount an as-applied challenge to some policy or practice of disciplining physician speech by the Boards.  However, plaintiffs have failed

1  to establish standing to challenge any such policy or practice.[4]

2         Article III standing has three elements: "(1) injury-

3  in-fact -- plaintiff must allege concrete and particularized and

4  actual or imminent harm to a legally protected interest; (2)

5  causal connection -- the injury must be fairly traceable to the

6  conduct complained of; and (3) redressability -- a favorable

7  decision must be likely to redress the injury-in-fact." Barnum

8  Timber Co. v. U.S. EPA, 633 F.3d 894, 897 (9th Cir. 2011) (citing

9  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)) (internal

10 quotation marks omitted).

11        "[A] plaintiff satisfies the injury-in-fact requirement

12 where he alleges 'an intention to engage in a course of conduct

13 arguably affected with a constitutional interest, but proscribed

14 by a statute, and there exists a credible threat of prosecution

15 thereunder.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149,

16 159 (2014) (quoting Babbitt v. United Farm Workers Nat'l Union,

17 442 U.S. 289, 298 (1979)).  The Ninth Circuit applies a "three-

18 factor inquiry to help determine whether a threat of enforcement

19 is genuine enough to confer an Article III injury": "(1) whether

20 the plaintiff has a 'concrete plan' to violate the law, (2)

21 whether the enforcement authorities have 'communicated a specific

22 warning or threat to initiate proceedings,' and (3) whether there

23 is a 'history of past prosecution or enforcement.'" Tingley, 47

24 F.4th at 1067 (quoting Thomas v. Anchorage Equal Rts. Comm'n, 220

25 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).  "'Neither the mere

26 ────────────

27      [4]   Although defendants did not expressly argue that
   plaintiffs lack standing, the court nonetheless has a duty to
   evaluate Article III standing.  See Bernhardt v. County of Los
28 Angeles, 279 F.3d 862, 868 (9th Cir. 2002).

1    existence of a proscriptive statute nor a generalized threat of

2    prosecution' satisfies this test." Id. (quoting Thomas, 220 F.3d

3    at 1139).

4         Challenges that involve First Amendment rights "present

5    unique standing considerations" because of the "chilling effect

6    of sweeping restrictions" on speech. Ariz. Right to Life Pol.

7    Action Comm. v. Bayless, 320 F.3d 1002, 1006 (9th Cir. 2003).

8    "In order to avoid this chilling effect, the Supreme Court has

9    endorsed what might be called a 'hold your tongue and challenge

10   now' approach rather than requiring litigants to speak first and

11   take their chances with the consequences." Italian Colors Rest.

12   v. Becerra, 878 F.3d 1165, 1171 (9th Cir. 2018) (internal

13   quotation marks omitted). Accordingly, when the challenged law

14   "implicates First Amendment rights, the [standing] inquiry tilts

15   dramatically toward a finding of standing." LSO, Ltd. v. Stroh,

16   205 F.3d 1146, 1155 (9th Cir. 2000).

17        Nonetheless, a plaintiff challenging a law on First

18   Amendment grounds must still demonstrate that "there exists a

19   credible threat of prosecution thereunder." See Susan B. Anthony

20   List, 573 U.S. at 159; see also Italian Colors Rest., 878 F.3d at

21   1171 ("Even in the First Amendment context, a plaintiff must show

22   a credible threat of enforcement.").

23        Plaintiffs have failed to make the necessary showing,

24   as the record is utterly devoid of any evidence that the Boards

25   have or may use their authority under section 2234(c) to do

26   anything other than regulate physician conduct, let alone

27   discipline physicians for their protected speech in the manner

28   plaintiffs suggest.

1          1.   <u>Threat of Enforcement</u>

2          To show that authorities have communicated a threat of

3    enforcement, plaintiffs point to a statement allegedly made by

4    Assemblyman Evan Low (a sponsor of AB 2098) following the repeal

5    of AB 2098.  Low purportedly stated that, despite the law's

6    repeal, "the Medical Board of California will continue to

7    maintain the authority to hold medical licensees accountable for

8    deviating from the standard of care and misinforming their

9    patients about COVID-19 treatments."  (<u>See</u> Verified Compl. ¶ 73.)

10   Assuming that Mr. Low, in fact, made that statement (which

11   plaintiffs have not established)[5], it provides no support for

12   plaintiffs' argument.  Mr. Low is not a defendant in this action.

13   And the pronouncement of a politician, without more, does not

14   indicate that the Boards -- administrative agencies that operate

15   independently of the California Legislature -- will apply the law

16   in any particular way.  <u>See</u> <u>Dist. of Columbia v. Heller</u>, 554 U.S.

17   570, 605 (2008) (explaining that so-called "postenactment

18   legislative history" is not legislative history at all and is not

19   a proper interpretive tool); <u>Graham Cnty. Soil & Water</u>

20   <u>Conservation Dist. v. U.S. ex rel. Wilson</u>, 559 U.S. 280, 297

21   (2010) ("a single sentence by a single legislator" is not

22    

23        [5]   The statement was provided by plaintiffs only in the form of an unsupported allegation.  (<u>See</u> Verified Compl. ¶ 73.)

24   However, the court was able to locate a Los Angeles Times article containing the quote from Assemblyman Low.  <u>See</u> Corinne Purtill,

25   <u>Controversial law punishing doctors who spread COVID misinformation on track to be undone</u>, Los Angeles Times (Sept.

26   11, 2023).  The court takes judicial notice of the fact that said quote was attributed to Mr. Low "in the public realm at the time"

27   but expresses no opinion about "whether the contents of th[e] article[] were in fact true."  <u>See</u> <u>Von Saher v. Norton Simon</u>

28   <u>Museum of Art at Pasadena</u>, 592 F.3d 954, 960 (9th Cir. 2010).

"entitled to any meaningful weight"); Chem. Producers & Distribs. Ass'n v. Helliker, 463 F.3d 871, 879 (9th Cir. 2006), overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers, 941 F.3d 1195 (9th Cir. 2019) ("Attributing the actions of a legislature to third parties rather than to the legislature itself is of dubious legitimacy, and the cases uniformly decline to do so."); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 69 (2d Cir. 1999) (the actions of legislators who "cajole" and "exhort" agencies concerning administration of a statute are "political rather than legislative in nature"); Goolsby v. Blumenthal, 581 F.2d 455, 460 (5th Cir. 1978), on reh'g, 590 F.2d 1369 (5th Cir. 1979) (quoting Reg'l Rail Reorg. Act Cases, 419 U.S. 102, 132 (1974)) ("post-passage remarks of legislators . . . 'represent only the personal views of these legislators'").

　　　　　To establish a history of prior enforcement, plaintiffs point to the alleged Board discipline of a physician who is not a plaintiff in this action, Dr. Ana Reyna, for her provision of certain COVID-19-related information and opinions.  However, plaintiffs provide nothing more than bare, unverified allegations concerning the basis for Dr. Reyna's Board discipline.  (See Verified Compl. ¶¶ 21, 74.)  The only evidence before the court concerning Dr. Reyna shows that she surrendered her license following the commencement of disciplinary proceedings.  (See id.)  Because plaintiffs have not provided (and the court was unable to locate) evidence regarding the basis for the disciplinary action, the court disregards these allegations.

　　　　　Finally, plaintiffs rely on the administrative and

1  legislative history related to AB 2098 to demonstrate that their
2  desired speech concerning COVID-19 is proscribed by Board policy.
3  But this case pertains to section 2234, not the now-repealed AB
4  2098.  Plaintiffs have provided no evidence that the Boards have
5  or will treat the repeal of AB 2098 -- along with this court's
6  preliminary injunction order and the Ninth Circuit panel's
7  skepticism of the law during oral argument on the McDonald
8  appeal[6] -- as anything other than a mandate to refrain from
9  improper regulation of doctors' speech.  See Rosebrock v. Mathis,
10 745 F.3d 963, 971 (9th Cir. 2014) ("We presume that a government
11 entity is acting in good faith when it changes its policy.").
12 Indeed, defendant Varghese stated in his capacity as Executive
13 Director of the Medical Board that, following the passage of the
14 repeal bill, AB 2098 would not be enforced even while it was
15 still in effect.  See McDonald, 94 F.4th at 869.

16      Accordingly, the court concludes that plaintiffs have
17 failed to establish that there is any threat the Boards will
18 enforce section 2234(c) or otherwise discipline physicians in a
19 manner that implicates their protected speech.

20           2.   COVID-19 and the Standard of Care

21      Plaintiffs additionally argue that they face a risk of
22 discipline for any care provided to treat COVID-19 because "there
23 is no legitimate [COVID-19] standard of care."  (See Docket No.
24 14 at 13.)  In support of that argument, they cite the
25 declaration they relied upon in Hoang v. Bonta (see Hoang Docket

26

27      [6]   See Oral Argument at 18:16 - 31:00, McDonald v. Lawson,
   94 F.4th 864, No. 22-56220 (9th Cir. 2023),
28 https://www.ca9.uscourts.gov/media/video/?20230717/22-56220/.

No. 4-2) and a declaration filed in this matter providing
additional information and scientific updates (see Kory Docket
No. 14-1).  The declarations, authored by Dr. Sanjay Verma and
not objected to by defendants, explain the various ways in which
the scientific evidence on COVID-19 has changed over time and
remains contested.  They also explain several ways in which the
pronouncements of public health authorities concerning COVID-19
have vacillated, at times to the point of either inconsistency
with scientific evidence or direct contradiction of prior
recommendations.

          For example, Dr. Verma points out that at the beginning
of the pandemic, the CDC represented that cloth masks prevented
COVID-19 transmission and recommended their use among the general
population.  (See Hoang Decl. ¶¶ 13-18; Appendix 1 to Hoang
Decl.)  Later, scientific studies showed that cloth masks were
not effective at preventing the spread of COVID-19, and the CDC
eventually changed its recommendation concerning their use.  (See
id.)  As another example, Dr. Verma avers that the CDC continues
to recommend that the general population keep "up to date" on
COVID-19 vaccines and boosters, despite studies showing dwindling
vaccine efficacy and the potential for serious side effects.
(See Kory Decl. ¶¶ 39-46.)  From such changes, disagreement, and
inconsistencies, plaintiffs make the logical leap that there is
no standard of care for COVID-19 treatment, placing them at risk
of discipline for all COVID-19-related care.

          The court can understand plaintiffs' frustration over
the various discrepancies and shifts in recommendations
concerning COVID-19.  And the inconsistencies apparent in many of

those recommendations unfortunately do not reflect well on the credibility of those who made them.  However, it simply does not follow that there is no standard of care applicable to COVID-19. It cannot be the case that scientific disagreement and inconsistencies in public health recommendations exempt doctors from the requirement that they adhere to the standard of care.

The standard of care is a well-established legal concept, "requir[ing] that medical service providers exercise that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances."  See Barris v. County of Los Angeles, 20 Cal. 4th 101, 108 (1999).  As defendants point out, this standard, in one formulation or another, has governed the practice of medicine for centuries.  See Robert I. Field, The Malpractice Crisis Turns 175: What Lessons Does History Hold for Reform?, 4 Drexel L. Rev. 7, 10 (2011) ("[t]he earliest lawsuits for medical mistakes date back several centuries to the formative stages of the common law," with the "first reported case . . . decided in 1374"); see also Arnett v. Dal Cielo, 14 Cal. 4th 4, 7 (1996) ("[s]ince the earliest days of regulation," the California medical boards "have been charged with the duty to protect the public against incompetent, impaired, or negligent physicians").  The application of a professional standard of practice is hardly unique to the healthcare context.  See, e.g., Gunn v. Minton, 568 U.S. 251, 264 (2013) (indicating that states have "a special responsibility for maintaining standards among members of the licensed professions," including through the imposition of standards of practice for lawyers) (internal quotation marks and

1    citations omitted).

2         "The standard of care against which the acts of a

3    physician are to be measured is a matter peculiarly within the

4    knowledge of experts; it . . . can only be proved by their

5    testimony, unless the conduct required by the particular

6    circumstances is within the common knowledge of the layman."

7    Flowers v. Torrance Mem'l Hosp. Med. Ctr., 8 Cal. 4th 992, 1001

8    (1994).  (See also Calderon Decl. (Docket No. 17-1) ¶¶ 6-7,

9    Varghese Decl. (Docket No. 17-2) ¶¶ 5-6 (explaining that when the

10   Boards investigate a physician, a "medical consultant . . .

11   examines the medical record and any additional evidence to

12   determine whether there is a potential violation of the standard

13   of care," in which case the matter is subject to further review

14   by a "retained outside medical expert").  Importantly, because

15   determination of the appropriate standard of care "is inherently

16   situational, the amount of care deemed reasonable in any

17   particular case will vary."  Flowers, 8 Cal. 4th at 997 (emphasis

18   added).  No court could make a broad pronouncement about the

19   standard(s) of care applicable to an entire disease -- which can

20   present a vast range of clinical presentations and possible

21   treatment options -- let alone conclude that no such standard

22   exists.

23         That the standard of care remains in force in the

24   COVID-19 context is supported by common sense.  Although there

25   may be areas of uncertainty when it comes to COVID-19, there are

26   nonetheless types of treatment that are clearly not permissible.

27   As a purely hypothetical example, if a doctor were to order a

28   patient under his care to drink a gallon of industrial rat poison

to treat COVID-19, no one could argue that would be consistent with the standard of care.  To conclude otherwise would interfere with the State's appropriate exercise of its authority to ensure that patients are protected from "charlatan[s]" masquerading as professionals.  See Pickup, 740 F.3d at 1228.

Seeking to brush aside the centuries-long regulation of the medical profession, plaintiffs seem to conflate the standard of care with the vague notion of "scientific consensus."  Their argument is premised on this court's prior finding that COVID-19 was "a quickly evolving area of science that in many aspects eludes consensus," and therefore the term "scientific consensus" was unconstitutionally vague.  See Høeg, 652 F. Supp. 3d at 1188. While the concept of a "consensus" among the medical community may be related to the standard of care, the terms are not interchangeable.  And as indicated above, plaintiffs have not offered any evidence that, following the repeal of AB 2098, the Boards will discipline doctors in a manner that conflates the two.

Plaintiffs also appear to treat the standard of care as a rigid benchmark that cannot countenance reasonable medical disagreement.  To the contrary, the standard of care can and does account for differing views among medical professionals.  See McAlpine v. Norman, 51 Cal. App. 5th 933, 938-39 (3d Dist. 2020) (indicating that the standard of care in a medical malpractice action is routinely determined based on "competing expert testimony"); Blackwell v. Hurst, 46 Cal. App. 4th 939, 944 (2d Dist. 1996) ("a difference of medical opinion concerning the desirability of a particular medical procedure when several are

23

1  available does not establish that the one used was negligent");

2  Glover v. Bd. of Med. Quality Assurance, 231 Cal. App. 3d 203,

3  208 (1st Dist. 1991) ("As long as the differences of opinion [on

4  the standard of care] are legitimate, we have no dispute with the

5  notion that different methods of treatment can all be considered

6  acceptable medical practice."); Fraijo v. Hartland Hosp., 99 Cal.

7  App. 3d 331, 343 (2d Dist. 1979) (a physician's "error in medical

8  judgment" in selecting among treatment options is not

9  automatically considered negligent, but rather is "weighed in

10  terms of the professional standard of care"); Gearhart v. United

11  States, No. 15-cv-665 MDD, 2016 WL 3251972, at *9 (S.D. Cal. June

12  14, 2016) ("Under California law, a mere difference of medical

13  opinion is insufficient evidence to support a finding of

14  negligence.").

15       "Professionals might have a host of good-faith

16  disagreements, both with each other and with the government, on

17  many topics in their respective fields."  NIFLA, 585 U.S. at 772.

18  "Only rarely does the physician enjoy true certainty regarding

19  any issue."  1 Am. Law Med. Malp. § 3:8.  Disagreement between

20  competent medical professionals on the best course of treatment

21  for a given condition is common, and there is not necessarily any

22  violation of the standard of care in those circumstances.  See

23  id. § 3:3 ("Within certain clinical settings, there may be

24  reasonably applicable alternative methods of diagnosis or

25  treatment.  A physician choosing one or the other method would

26  not violate a 'standard' of good medical practice."); see also

27  Philip G. Peters, Jr., Doctors & Juries, 105 Mich. L. Rev. 1453,

28  1477 (2007) ("when researchers ask physicians to rate the quality

of care provided by other physicians, the participants disagree among themselves" at a "surprisingly high" rate, as "[r]easonable professionals often reach different conclusions about the same evidence"); Peter D. Jacobson & Stefanie A. Doebler, "We Were All Sold A Bill of Goods:" Litigating the Science of Breast Cancer Treatment, 52 Wayne L. Rev. 43, 79 (2006) (in evaluating whether a novel treatment option comports with the standard of care, part of a court's task is to determine "when the widespread disagreement among qualified medical experts over whether the treatment or procedure at issue has crossed the line from being an experimental procedure to become an acceptable medical practice"); James Ducharme, Clinical Guidelines and Policies: Can They Improve Emergency Department Pain Management?, 33 J.L. Med. & Ethics 783, 786 (2005) ("If there is more than one recognized course of treatment, most courts will allow some flexibility in what is regarded as customary."); Joan P. Dailey, The Two Schools of Thought and Informed Consent Doctrines in Pennsylvania: A Model for Integration, 98 Dick. L. Rev. 713, 714 (1994) ("Courts have long recognized that medicine is not an exact science and that therefore physicians are bound to disagree over the propriety of various treatments.").

Even medical approaches that are in the minority can be considered within the standard of care.  See 1 Am. Law Med. Malp. § 3:3 ("What is custom and practice in the medical profession is usually a reliable measure of due care.  However, that is not always the case.") (citing Texas & P. Ry. Co. v. Behymer, 189 U.S. 468, 470 (1903)).  It could even be considered a violation of the standard of care to continue using a long-established

1    treatment if a doctor failed to remain informed of advances in

2    medical knowledge.  See id. ("The standard of care clearly

3    requires a doctor to keep up to date and abreast of changes.").[7]

4           As the Supreme Court has stated, states have "wide

5    discretion to [regulate] areas where there is medical and

6    scientific uncertainty."  See Gonzales, 550 U.S. at 163.  COVID-

7    19 is far from the first medical topic to prompt controversy and

8    serious disagreement among doctors and scientists.  See, e.g.,

9    Conant, 309 F.3d at 643 (Kozinski, J., concurring) (describing

10   the "genuine difference of expert opinion on the subject [of

11   medical marijuana], with significant scientific and anecdotal

12   evidence supporting both points of view"); Caroline Lowry,

13   Intersex in 2018: Evaluating the Limitations of Informed Consent

14   in Medical Malpractice Claims As A Vehicle for Gender Justice, 52

15   Colum. J.L. & Soc. Probs. 321, 339 (2019) ("[t]he standard of

16   care for treating intersex individuals is controversial and ever-

17   changing" due in part to "sparse and incomplete" research on the

18   topic); Katherine Goodman, Prosecution of Physicians As Drug

19   Traffickers: The United States' Failed Protection of Legitimate

20   Opioid Prescription Under the Controlled Substances Act and South

21   _____

22   [7]    Indeed, California law recognizes that medical science
     is frequently changing and can offer worthwhile treatments that
23   are not broadly accepted.  The California Right to Try Act, Cal.
     Health & Safety Code § 111548, provides that a patient with a
24   life-threatening disease who has considered all available FDA-
     approved treatment options and is unable to participate in an
25   applicable clinical trial has the right to undergo an
     "investigational" treatment recommended by his physician, see id.
26   § 111548.1(b).  A physician is immune from Board discipline for
     prescribing investigational treatments under those circumstances,
27   when carried out in accordance with the procedural protocol
     established by the relevant Board.  See id. § 111548.3(a).

28

1    <u>Australia's Alternative Regulatory Approach</u>, 47 Colum. J.

2    Transnat'l L. 210, 226–27 (2008) ("physicians widely disagree

3    about the propriety of administering narcotics for short-term

4    pain or to addicts, and there is little agreement about the

5    addiction risks that narcotics present" and "the maximum

6    thresholds for high-dose opioid therapy").  It would be absurd to

7    conclude that the State forfeits its broad authority to regulate

8    the practice of medicine whenever such disagreement is present.

9         For the court to conclude that no standard of care

10   exists in the realm of COVID-19 would create an unprecedented

11   exception to the long-established regulatory paradigm governing

12   medical professionals.  Such a conclusion would also functionally

13   exempt doctors from both private malpractice actions and

14   disciplinary proceedings under section 2234(c) whenever they

15   provide care in connection with that disease, placing the public

16   at risk of harm without recourse or adequate oversight.

17         Because plaintiffs have failed to establish a

18   likelihood of success on the merits of their First Amendment

19   challenge to California Business & Professions Code § 2234, IT IS

20   HEREBY ORDERED that plaintiffs' motion for preliminary injunction

21   (Docket No. 14) be, and the same hereby is, DENIED.

22   Dated:  April 22, 2024

23                      WILLIAM B. SHUBB

                       UNITED STATES DISTRICT JUDGE

24

25

26

27

28