UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

PIERRE KORY, M.D., LE TRINH
HOANG, D.O., BRIAN TYSON, M.D.,
PHYSICIANS FOR INFORMED CONSENT,
a not-for-profit corporation,
and CHILDREN'S HEALTH DEFENSE, a
not-for-profit corporation,

          Plaintiffs,

    v.

ROB BONTA, in his official
capacity as Attorney General of
California, REJI VARGHESE, in
his official capacity as
Executive Director of the
Medical Board of California, and
ERIKA CALDERON, in her official
capacity as Executive Officer of
the Osteopathic Medical Board of
California,

          Defendants.

No. 2:24-cv-1 WBS AC


MEMORANDUM AND ORDER RE:
RENEWED MOTION FOR
PRELIMINARY INJUNCTION

----oo0oo----

      Plaintiffs Pierre Kory, Le Trinh Hoang, Brian Tyson,

Physicians for Informed Consent, and Children's Health Defense

1

brought this § 1983 action against defendants Rob Bonta, in his official capacity as Attorney General of California, and Reji Varghese and Erika Calderon, in their official capacities as Executive Director and Executive Officer of the Medical Board of California and the Osteopathic Medical Board of California, (respectively, the "Boards").  (Verified Compl. (Docket No. 9).) Plaintiffs Kory, Hoang, and Tyson are physicians licensed by the Boards.  The remaining two plaintiffs are organizations representing the interests of doctors and patients.

Plaintiffs now bring an as-applied First Amendment challenge to the Boards' power to discipline physicians under Cal. Bus. & Prof. Code § 2234 for their COVID-19-related speech pursuant to the Boards' extra-statutory COVID misinformation policy.

I.   Background

Plaintiffs initially filed their motion for preliminary injunction in February 2024, asserting both facial and as-applied First Amendment challenges to Cal. Bus. & Prof. Code § 2234. (Pls.' Mot. for Preliminary Injunction ("PI Mot.") (Docket No. 14).)  In April 2024, the court denied the motion.  (Order Denying Preliminary Injunction ("PI Order") (Docket No. 23).)

In its PI Order, the court found that Section 2234 was a facially constitutional "regulation of professional conduct with only an incidental effect on speech, if any," and was, therefore, only subject to rational basis review.  (Id. at 13.) The court held also that "when a doctor speaks in his capacity as the patient's treating physician and incident to his provision of

2

medical care, the physician's words constitute regulable conduct."  (Id. at 10—11 (emphasis in original).)  As such, the court concluded that plaintiffs had failed to establish Article III standing as required to bring an as-applied challenge under the First Amendment and, as a result, failed to demonstrate that they were likely to succeed on the merits.  (Id. 19, 27.)

Plaintiffs then filed an interlocutory appeal.  (Pls.' Notice of Interlocutory Appeal ("Interlocutory Appeal") (Docket No. 24).)  In November 2024, a panel of the Ninth Circuit affirmed this court's denial of plaintiffs' motion (see CA9 Mandate (Docket No. 39)); plaintiffs then sought review from the Supreme Court (see Parties' July 2025 Joint Status Report ("July 2025 JSR") (Docket No. 43)).

The parties filed another joint status report in May 2026 informing the court that the Supreme Court had denied plaintiffs' petition for certiorari.  (Parties' May 2026 Joint Status Report ("May 2026 JSR") (Docket No. 47 at 1); see also Kory v. Bonta, 224 L. Ed. 2d 496 (Apr. 20, 2026).)  The parties further advised this court of their mutual desire to file certain motions.  (May 2026 JSR at 1.)

Defendants proposed filing a motion to dismiss on the ground that "the Ninth Circuit's decision affirming this Court's ruling was left undisturbed by the U.S. Supreme Court."  (Id.) Plaintiffs, on the other hand, argued that "[t]he Ninth Circuit's memorandum disposition and this Court's underlying order have been abrogated by two intervening Supreme Court decisions" -- Chiles v. Salazar, 146 S. Ct. 1010 (2026) and First Choice

3

Women's Res. Centers, Inc. v. Davenport, 146 S. Ct. 1114 (2026) -- and so proposed filing a renewed motion for preliminary injunction, and potentially for summary judgment.  (May 2026 JSR at 1—2.)

After the court set a briefing schedule (Briefing Ord. (Docket No. 48)), plaintiffs filed a renewed motion for preliminary injunction on June 29, 2026.  (Pls.' Renewed Mot. for Preliminary Injunction ("Renewed PI Mot.") (Docket No. 49); see also Pls.' Request for Judicial Notice (Docket No. 50).) Defendants oppose the motion.  (Defs.' Opp. to Renewed Preliminary Injunction ("Renewed PI Opp.") (Docket No. 51).)

A.    The Challenged Policy

Whereas plaintiffs' February 2024 motion for preliminary injunction brought both facial and as-applied First Amendment challenges against Section 2234, their renewed motion for preliminary injunction takes a different tack.  Plaintiffs now concede that Section 2234 is facially constitutional.  (Pls.' Sur Reply (Docket No. 52) at 2 ("Plaintiffs bring no facial challenge to the words of a statute.").)  Rather, plaintiffs now bring only an as-applied challenge targeting the Boards' COVID Misinformation Policy (the "Policy") rather than Section 2234 itself.

Plaintiffs argue that the Policy originated with the July 2021 press release issued by the Federation of State Medical Boards, which read as follows:

> Physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary action by state medical boards, including

the suspension or revocation of their medical license. Due to the specialized knowledge and training, licensed physicians possess a high degree of public trust and therefore have a powerful platform in society, whether they recognize it or not. They also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factually, scientifically grounded and consensus driven for the betterment of public health. Spreading inaccurate COVID-19 vaccine information contradicts that responsibility, threatens to further erode public trust in the medical profession and thus puts all patients at risk.

(Renewed PI Mot. at 4.)

Subsequently, the Federation's policy statement was affirmed in the minutes of the Medical Board of California by the direction of Kristina Lawson, the California Board's president and chairwoman of the Federation's Ethics Committee who also simultaneously served as the California Board's Federation representative.  (Id.)

According to plaintiffs, minutes taken at the Board's February 10–11, 2022, meeting document Lawson's statement that "it is the duty of the board to protect the public from misinformation and disinformation by physicians," and that, consistent with the Federation's July 2021 statement, "physicians spreading misinformation or disinformation risk disciplinary action by their state medical board."  (Id. at 5.)

Noting that Lawson's statement was released prior to the introduction of California Assembly Bill ("AB") 2098 -- which addressed so-called misinformation relating to COVID but was later repealed -- plaintiffs argue that "the only possible statutory authority supporting [Lawson's] policy announcement was

[the] general standard-of-care power" contained within Cal. Bus. & Prof. Code § 2234.  (Id.)

Stated another way, the Policy as announced constitutes part of the Boards' broader standard-of-care power and, as such, utilizes Section 2234 as its enforcement mechanism.  (Id. at 5 ("Section 2234 makes departures from the standard of care, whether as gross negligence or as repeated negligent acts, a form of unprofessional conduct subject to discipline, and the Board's position, then and now, is that a physician who departs from what it deems the COVID standard of care commits a disciplinable act under that section.").)

Moreover, this enforcement scheme exists separately from the now-repealed statutory enforcement scheme contained in AB 2098.  (Id. at 5—6.)  Consequently, while this court enjoined Section 2270 -- the statute codifying AB 2089 once it was enacted -- that injunction did not reach enforcement of the Policy under Section 2234.  (Id. at 5.)  It is this scheme which plaintiffs now challenge.

II.  The Plaintiffs

Plaintiffs consist of (1) a physician formerly licensed in California, Dr. Pierre Kory; (2) a California physician, Dr. Le Trinh Hoang; (3) another California physician, Dr. Brian Tyson; (4) a nonprofit, Physicians for Informed Consent; (5) another nonprofit, Children's Health Defense; (6) a patient of Dr. Hoang, Ms. Debbie Hobel; and (7) a patient of Dr. Kory, Mr.

6

Niel Seflinger.  (See Renewed PI Mot. at 6—8.)[1]

A.   The Physician Plaintiffs

Dr. Kory is "a critical care physician and the co-founder and president of the Front-Line COVID-19 Critical Care Alliance."  (Pls.' Renewed PI Mot. at 7.)  Front-Line COVID-19 Critical Care Alliance ("FLCCC") is an organization that "advocates for the use of Ivermectin as a treatment for [COVID-19]."  (Verified Compl. at 13.)  Dr. Kory states that nearly his "entire practice is now devoted to the treatment of patients with COVID-19 vaccine injury and long COVID" and that many of his "patients would likely die if they received another COVID-19 vaccine."  (Decl. of Dr. Pierre Kory ("Dr. Kory Decl.") (Docket No. 49-1) at ¶ 2.)  According to Dr. Kory, "[t]he COVID-19 shots come up in nearly every patient discussion, because the injuries [he] treat[s] are caused by them."  (Id.)

He explains his interest in COVID-19-related speech as follows: "To care for these patients I must be able to speak to them honestly about the harms of the COVID-19 vaccines, including my opinion, based on what I see every day in my practice, that the vaccines are far more dangerous than the public health authorities admit.  If I could not speak freely to my patients about the risks of these shots, I could not do my work."  (Id. at ¶ 3.)  Dr. Kory further clarifies that he sees his claim in this case as being about his "right to advise and inform" his

---

[1]   The court refers to Dr. Kory, Dr. Hoang, and Dr. Tyson as the "Physician Plaintiffs," Physicians for Informed Consent and Children's Health Defense as the "Organizational Plaintiffs," and Ms. Hobel and Mr. Seflinger as the "Patient Plaintiffs."

patients, and "not a right to write prescriptions." (Id. at ¶ 4.)

Dr. Kory attests that due to his "fear that the California medical board might take action against [him] for Covid misinformation under its existing policy," after this court denied plaintiffs' first motion for preliminary injunction in 2024 (see PI Order), he elected to allow his California medical license to lapse and "will only reactivate this license if a preliminary injunction is granted protecting [his] First Amendment Free Speech rights." (Dr. Kory Decl. at ¶ 9.)

Dr. Hoang is "a pediatric osteopathic physician in Los Angeles County." (Renewed PI Mot. at 7.) In her practice, she provides patients and their families with advice "about the risks and benefits of COVID vaccines and boosters according to the patient's age, health status, and comorbidities." (Id. at 7; see also Verified Compl. at ¶ 24.)

Dr. Hoang "intends to tell her male patients between seventeen and thirty-nine of the elevated risk of cardiac adverse events from the mRNA vaccines in that subgroup, and she believes that advising against the vaccine for such a patient could draw a standard-of-care charge." (Renewed PI Mot. at 7; see also Verified Compl. at ¶¶ 25, 27.) Further, Dr. Hoang is "reluctant to give that advice unless the Court enjoins the Board." (Renewed PI Mot. at 7; see also Verified Compl. at ¶ 27.)

Dr. Tyson is "a board-certified family physician who owns an urgent care clinic in Southern California" and who "has treated thousands of COVID patients." (Renewed PI Mot. at 7–8.)

When treating patients who are athletes reporting chest pain, Dr. Tyson "inquires about vaccine status and discusses with the patient whether the vaccine caused the symptom."  (Id. at 7.)  In such cases, he also gives the patient his opinion, "based on the patients he has seen, that the cardiac risk is higher than the CDC represents."  (Id.; see also Verified Compl. at ¶¶ 30–31, 33; Decl. of Dr. Brian Tyson ("Dr. Tyson Decl.") (Docket No. 49-2) at ¶ 2.)

According to Dr. Tyson, his patients "ask about treatment and prevention, and they ask whether they should keep getting boosted."  (Dr. Tyson Decl. at ¶ 2.)  Additionally, he attests that "[p]arents . . . ask[] about vaccine exemptions for their children to attend school" and that other patients "come to [him] asking for exemptions from workplace vaccine requirements." (Id. at ¶ 3.)

Dr. Tyson states that he has already been investigated by the Boards for "what it called the spreading of COVID-19 misinformation to the public."  (Id. at ¶ 7.)  He explains that, "[t]he policy the Board announced through its President, Kristina Lawson, is also directed at misinformation on social media, in the media, and online, which is to say at exactly the public speech I have had to suppress."  (Id.)

Dr. Tyson alleges that his speech is currently chilled by the Board's policy both inside and outside the exam room. (Id. at ¶ 5.)  He explains that when he is asked to give an interview "about [his] experience and [his] opinions treating COVID-19 patients," he now either turns down those requests or

feels that he must "be very careful and selective about how [he] answer[s]" since he knows that what he says "publicly about vaccines and treatment is the same speech the Board has said it will discipline as misinformation."  (Id.)

As an example of these concerns in practice, Dr. Tyson attests that he decided not to run for Congress after concluding that his "campaign speeches would inevitably mix [his] political views with [his] professional medical opinions about COVID-19, and that saying publicly what [he] believe[s] and what [he] tell[s his] patients would expose [him] to another Board investigation and force [him] to defend [his] license again." (Id. at ¶ 6.)  He states that he "gave up the candidacy rather than take that risk."  (Id.)

B.    The Organizational Plaintiffs

Physicians for Informed Consent ("PIC") and Children's Health Defense ("CHD") are both nonprofit organizations which advocate for physicians' "freedom to give patients evidence-based information and for patients' right to receive it."  (Renewed PI Mot. at 8; see also Verified Compl. at 37—40, 48.).

C.    The Patient Plaintiffs

Ms. Hobel is a patient of Dr. Hoang while Mr. Seflinger is a patient of Dr. Kory.  (Renewed PI Mot. at 8.)  Ms. Hobel attests that following "the Court's 2023 injunction, she had the confidence to seek Dr. Hoang's honest opinion about whether her son should receive further boosters," but that after "the sponsor's office announced that the Board could continue to prosecute despite the repeal, she concluded she was 'back to

10

square one' and would wait until this Court decided the present motion before seeking that advice."  (Id.; see also Decl. of Ms. Debbie Hobel {"Ms. Hobel Decl.") (Docket No. 14-5) at ¶¶ 2, 7.)

Mr. Seflinger sought Dr. Kory's advice after suffering "a serious reaction to his first Moderna dose" and finding that his then-doctor "hesitated" and "recited the CDC's position that the second dose was recommended and side effects rare."  (Renewed PI Mot. at 8; see also Decl. of Mr. Niel Seflinger {"Mr. Seflinger Decl.") (Docket No. 14-6) at ¶¶ 1—3.)

III. Threshold Matters

A.    The Law of the Case

Defendants argue that plaintiffs' "renewed motion must fail" because it "is foreclosed by the law of the case: this Court and the Ninth Circuit have previously held that plaintiffs cannot state a viable facial challenge to Section 2234(c) and that they lack standing for an as-applied challenge."  (Renewed PI Opp. at 4—5.)  Defendants' arguments as to the applicability of the law of the case doctrine are unpersuasive for two reasons.

First, even where the law of the case doctrine is otherwise applicable, intervening authority and receipt of new evidence are both recognized exceptions to the doctrine, and a court may exercise its discretion to set aside the law of the case where either circumstance obtains.  Jeffries v. Wood, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc), overruled on other grounds by Gonzalez v. Arizona, 677 F.3d 383 (9th Cir. 2012) (quoting In re Rainbow Magazine, Inc., 77 F.3d 278, 281 (9th Cir. 1996)) ("The prior decision should be followed unless: '(1) the

11

decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.'").

Here, both exceptions apply. Despite defendants' assertions to the contrary, the Supreme Court's decisions in Chiles v. Salazar, 146 S. Ct. 1010 (2026) and First Choice Women's Res. Centers, Inc. v. Davenport, 146 S. Ct. 1114 (2026) do constitute intervening authorities. Additionally, the record before the court now includes significant new evidence with respect to the details of the In re Reyna Proceedings. (See In re Accusation Against Ana Reyna, M.D. ("Reyna Proceedings") (Docket No. 50, Ex. A).) Because the full accusation from In re Reyna was not made available to this court at the time of its ruling on the first motion for preliminary injunction, its inclusion now constitutes a change in circumstances and the court properly considers it as new evidence.

Second, defendants misunderstand the doctrine's scope of applicability. (See Renewed PI Opp. at 4–12.) Contrary to defendants' reading, the doctrine is not rigidly applicable at the PI stage. Indeed, the Ninth Circuit has specifically instructed that district courts "should abide by 'the general rule' that our decisions at the preliminary injunction phase do not constitute the law of the case." Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr., 499 F.3d 1108, 1114 (9th Cir. 2007); see also Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1076 (9th Cir. 2015) ("The 'general rule'

12

is that our decisions 'at the preliminary injunction phase do not constitute the law of the case.'" (emphasis added)).

For these reasons, the court finds that, under the law of the case doctrine, it is not bound by either its previous PI Order (Docket No. 23) or the Ninth Circuit's affirmance (Docket No. 39).

B.    Article III Standing

"[A]s a threshold matter, [p]laintiff[s] must have standing to sue." Rosenblum v. Does 1-10, 474 F. Supp. 3d 1128, 1132 (D. Or. 2020). The court addresses this "threshold jurisdictional [issue]" first. See Pirozzi v. Apple, Inc., 966 F. Supp. 2d 909, 917 (N.D. Cal. 2013).

"To establish constitutional standing, plaintiffs must demonstrate three elements": (1) an injury-in-fact that is "concrete and particularized" and "actual or imminent"; (2) a causal connection, meaning the injury must be "fairly traceable" to the "conduct complained of," and (3) redressability, meaning that a "favorable decision" would be "likely to redress the injury-in-fact." Barnum Timber Co. v. U.S. E.P.A., 633 F.3d 894, 897 (9th Cir. 2011) (citation modified). Plaintiffs must "demonstrate standing for each claim [they] seek[] to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

Challenges that involve First Amendment rights "present unique standing considerations" because of the "chilling effect of sweeping restrictions" on speech. Ariz. Right to Life Pol. Action Comm. v. Bayless, 320 F.3d 1002, 1006 (9th Cir. 2003). "In order to avoid this chilling effect, the Supreme Court has

13

endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." Italian Colors Rest. v. Becerra, 878 F.3d 1165, 1171 (9th Cir. 2018) (internal quotation marks omitted). Accordingly, when the challenged law "implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." LSO, Ltd. v. Stroh, 205 F.3d 1146, 1155 (9th Cir. 2000).

### 1. The Physician Plaintiffs

#### i. Injury-in-Fact

"[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

This court previously applied the "three-factor inquiry" established in Tingley v. Ferguson, 47 F.4th 1055, 1067 (9th Cir. 2022), to evaluate whether plaintiffs had alleged an injury sufficient to confer Article III standing to bring their as-applied First Amendment claim. The Tingley factors ask: "(1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement.'" Id. (quoting Thomas v. Anchorage Equal Rts. Comm'n, 220 F.3d

14

1134, 1139 (9th Cir. 2000) (en banc)).  Crucially, under Tingley, "'[n]either the mere existence of a proscriptive statute nor a generalized threat of prosecution' satisfies this test."  Id. (quoting Thomas, 220 F.3d at 1139).

On that analysis, this court held -- and the Ninth Circuit later affirmed -- that because the record was "utterly devoid of any evidence that the Boards have or may use their authority under Section 2234(c) to do anything other than regulate physician conduct, let alone discipline physicians for their protected speech in the manner plaintiffs suggest," plaintiffs had failed to establish a credible threat as required under Tingley.  (See PI Order at 16; see also CA9 Mandate at 3-4.)

This court's earlier holding relying on Tingley, however, must be reexamined in light of intervening authority and the availability of additional evidence.

a.   First Choice as Intervening Authority

The Supreme Court recently further clarified its First Amendment standing doctrine in First Choice Women's Res. Centers, Inc. v. Davenport, 146 S. Ct. 1114 (2026).  There the Court held unanimously that an injury in fact may be established merely by the existence of a credible threat of enforcement.  Id. at 1127—28 (2026).  "[S]elf-censorship in response to a 'well-founded fear that the law will be enforced against them' is an injury in fact 'that can be realized even without an actual prosecution.'"  Id. at 1127 (quoting Virginia v. American Booksellers Assn., Inc., 484 U.S. 383, 393 (1988)).

The First Amendment forbids the state from "marginalizing dissident voices and reshaping the marketplace of ideas to its pleasure," accordingly, the protections that flow from that extend to "prohibit[] 'subtle ... interference' with protected liberties no less than it does 'heavy-handed frontal attack[s].'"  Id. at 1130.  The Court explained that the relevant question is not how severely the state has burdened a plaintiff's First Amendment rights; rather, "the question is whether [the state] has burdened those rights at all."  Id. at 1129.

Thus, under First Choice, neither a history of actual enforcement nor evidence of a particularized imminent threat of enforcement are necessary.  What matters, instead, is whether the threat of enforcement is sufficiently credible to support the plaintiff's fear of enforcement and thereby incentivize self-censorship.  See id. at 1127 ("[T]the value of a sword of Damocles is that it hangs—not that it drops." (quoting Arnett v. Kennedy, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting) (quotation marks omitted)) (Gorsuch, J.).

Applied here, then, plaintiffs do not need to show that they face a credible threat of enforcement specific to them.  Instead, to satisfy their burden Physician Plaintiffs only need to show that their fear of enforcement is well-founded.

### b.    The Threat of In re Reyna

The Section 2234 enforcement proceedings against Dr. Ana Reyna provide Physician Plaintiffs with ample grounds to fear

16

enforcement of the challenged policy.[2]  On June 23, 2023, Dr. Ana Reyna was served with an Accusation by the Medical Board of California charging her with the commission of gross negligence and repeated negligent acts in violation of Sections 2234(b) and 2234(c) as a result of her conduct and speech during an April 2, 2021, clinical visit with "Patient A."  See In re Accusation Against Ana Reyna, M.D., Case No. 800-2021-076688, Accusation (Medical Board of California).

The Board accused Dr. Reyna of having committed grossly negligent and repeated departures from the standard of care when she: (1) "advised Patient A against being vaccinated"; (2) "represented that the three available vaccines contained fetal tissue, would alter his DNA irreparably, and were linked to a significant increase in miscarriages"; (3) "indicated that [she] referred to a medical podcast for the source of some of her advice"; (4) "expressed a belief that any information representing that COVID was worse than a common flu was politically motivated, with an intent to negatively impact the then current administration"; (5) "indicated that masks do not stop COVID"; (6) "told Patient A that his girlfriend should avoid the COVID vaccines, if she wants to get pregnant"; (7) "told Patient A that when dealing with patients who exhibited COVID symptoms she directed them to purchase veterinary Ivermectin";

---

[2]    The court takes judicial notice of the fact that the Medical Board of California prosecuted a disciplinary action (Case No. 800-2021-076688) against Dr. Ana Reyna under Cal. Bus. & Prof. Code § 2234 for the reasons set out in the Accusation and Order attached to plaintiffs' Request for Judicial Notice as Exhibit A. (See Pls.' Request for Judicial Notice, Ex. A (Docket No. 50) at 8—23.)

17

(8) "told Patient A that the vaccines were responsible for 366% increase in miscarriages Respondent read this information in a European paper"; and (9) offered medical advice for Patient A's girlfriend even though she was "not a treating physician of Patient A's girlfriend, and had not been provided with her medical history, or information related to whether the couple had an interest in having children." Id., Accusation at ¶¶ 10–12.[3]

According to the Accusation, Dr. Reyna's statements and advice to Patient A were "misleading" because she failed to also tell the patient "that she was advising actions/inactions that fell below the standard of care in the community." Id., Accusation at ¶ 16. The Accusation explained that, "[w]hether singly or in combination with one another, by making one or more of the statements set forth," Dr. Reyna "committed an extreme departure from the standard of care by providing advice about COVID-19 that was not accurate, and did not clearly relay to Patient A that the advice did not comport with the standard of care in the community." Id.

To avoid additional unnecessary expense and uncertainty, Dr. Reyna waived her procedural rights and entered into a Stipulated Surrender of License in which she accepted culpability for the factual allegations laid out in the Accusation, agreed to voluntarily surrender her medical license, and was ordered to pay the Board $12,111.25 for its investigation and enforcement costs. See In re Accusation Against Ana Reyna,

---

[3]    The only conduct-based departure from the standard of care alleged in the Accusation was Dr. Reyna's failure to wear a mask during Patient A's clinical visit. Id., Accusation at ¶ 15.

M.D., Case No. 800-2021-076688, Order (Medical Board of California).

Specifically, the stipulation signed by Dr. Reyna included the following language:  (1) "Respondent understands that the charges and allegations . . ., if proven at a hearing, constitute cause for imposing discipline upon her Physician's and Surgeon's Certificate" and (2) ". . . Respondent agrees that, at a hearing, Complainant could establish a factual basis for the charges in the Accusation and that those charges constitute cause for discipline."  Id. at ¶¶ 8—9.  These statements do not limit Dr. Reyna's culpability to the one conduct-based charge but encompass every pure-speech-based charge alleged by the state.

The actions of the Board in requiring Dr. Reyna to enter into those stipulations in order to resolve the Accusation against her illustrate precisely the sort of enforcement that Physician Plaintiffs claim to be credibly threatened by.  Thus, Physician Plaintiffs' fears are both reasonable and well-founded.

Dr. Kory advocates for the use of Ivermectin to treat COVID-19, advises his patients about the risks of COVID vaccine injuries, which, in his professional opinion, are significantly more dangerous than public health officials claim.  (See Verified Compl. at ¶ 13; see also Dr. Kory Decl. at ¶¶ 2—3.)  Dr. Hoang advises her patients about the health risks of the COVID vaccines and recommends some patients against receiving the vaccine for some patients.  (See Verified Compl. at ¶ 24.)  And Dr. Tyson believes the COVID vaccines pose a significantly greater cardiac risk than the CDC admits, requires some vaccinated patients

19

reporting chest pain to be examined by a cardiologist, advises on vaccine exemptions for schools and workplaces, gives interviews discussing his medical opinions, and shares his medical opinions on social media.  (See Renewed PI Mot. at  7—8; see also Dr. Tyson Decl. at ¶¶ 2, 3, 5—7, 9.)

All three Physician Plaintiffs reasonably fear that the challenged policy will be enforced against them for their COVID-related speech and engage in various forms of self-censorship because of that threat.  Dr. Kory voluntarily allowed his California medical license to lapse, and attests that he will not renew his license until the challenged policy is enjoined by a court.  (Dr. Kory Decl. at ¶ 9.)  Dr. Hoang attests to feeling apprehensive about sharing her honest COVID-related medical opinions with her patients until the challenged policy's enforcement threat is enjoined.  (Renewed PI Mot. at 7.)  Dr. Tyson also attests that he self-censors by being more selective with which interview requests he accepts and by choosing his words cautiously in those interviews he still accepts.  (Dr. Tyson Decl. at ¶ 5.)  Additionally, Dr. Tyson further attests that he decided not to run for a seat in Congress after concluding that his campaign speeches would unavoidably include speech the Boards consider COVID misinformation and thereby expose him to the threat of enforcement under the challenged policy.  (Id. at ¶ 6.)

The record and evidence now before the court clearly establish the following:  (1) The Policy prohibits physicians licensed under the authority of the Boards from engaging in

20

speech that constitutes COVID-19 misinformation in the eyes of the Boards.  (2) Physician Plaintiffs have previously spoken in ways the Policy forbids, and they would continue to speak freely but for the prospect that the Boards' will enforce the Policy. And (3) Dr. Kory, Dr. Hoang, and Dr. Tyson each attest that they have previously engaged in speech that the Policy prohibits and that is substantially similar to the speech for which Dr. Reyna was subject to disciplinary action by the Medical Board of California.  (Compare Dr. Kory Decl. at ¶¶ 2—3, and Renewed PI Mot. at 7, and Dr. Tyson Decl. at ¶¶ 2—3, with In re Accusation Against Ana Reyna, M.D., Case No. 800-2021-076688, Accusation at ¶¶ 10—12, 16, 19 (Medical Board of California).)

Accordingly, the court finds that Physician Plaintiffs have alleged a credible threat that the Boards will enforce the Policy against them if they continue speaking as they have in the past and wish to do in the future.

ii.  Causal Connection

Here there is a causal connection between the injury and the challenged policy, because the policy explicitly and specifically targets the very viewpoints that Physician Plaintiffs have previously expressed, and which they intend to continue expressing.

Thus, insofar as the Physician Plaintiffs remain subject to the Boards' enforcement threat, the threat itself constitutes an ongoing injury-in-fact, and it is sufficient to support Article III standing to bring a First Amendment claim. There is therefore a direct causal link between the challenged

21

policy and Physician Plaintiffs' ongoing injuries.

### iii. Redressability

Because the injury-in-fact here is the threat of the policy's enforcement, an injunction prohibiting defendants from enforcing the policy against Physician Plaintiffs would constitute redress of their injury.

For the preceding reasons, the court finds that Physician Plaintiffs face an ongoing injury in fact resulting from the Policy's chilling effect on their speech.  Their injury is traceable to the Boards' policy and is redressable by an as-applied constitutional ruling in their favor.  Therefore, the court finds that Physician Plaintiffs have Article III standing to bring their as-applied First Amendment challenge to the Policy.

### 2.   The Organizational and Patient Plaintiffs

Because the court has found that the individual Physician Plaintiffs -- Dr. Kory, Dr. Hoag, and Dr. Tyson -- have Article III standing sufficient to support the full scope of the requested preliminary injunctive relief, the court need not, at this stage, make any determinations as to the standing of the Organizational and Patient Plaintiffs.  See Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006).[4]

---

[4]   To grant relief to any physicians beyond those named as parties here would constitute a universal injunction, which the Supreme Court has made clear the Constitution does not allow. "Under our well-established precedent. . . [n]othing like a universal injunction was available at the founding, or for that matter, for more than a century thereafter.  Thus, under the Judiciary Act, federal courts lack authority to issue them."

22

Moreover, the court only deals with controversies between the parties that are actually before it. "Because Article III limits courts to resolving specific 'Cases' and 'Controversies,' . . . it requires that any remedy 'be tailored to redress the plaintiff's particular injury." Trump v. CASA, Inc., 606 U.S. 831, 863 (2025) (Thomas, J., concurring) (internal citations omitted); see also id. (noting that "equitable remedies historically operated on a plaintiff-specific basis. . . . Accordingly, any 'remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" (internal citations omitted)).

IV.   Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).   Thus, plaintiffs, as the party "seeking a preliminary injunction," must "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).   The last two factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

---

Trump v. CASA, Inc., 606 U.S. 831, 856 (2025) (internal citations omitted)).

A.   <u>Likelihood of Success on the Merits</u>

Likelihood of success on the merits is "the most important factor in determining whether a preliminary injunction is warranted." <u>Garcia v. County of Alameda</u>, 150 F. 4th 1224, 1230 (9th Cir. 2025) (internal citations and quotation marks omitted).

Under the Supreme Court's First Amendment jurisprudence, including, most recently, <u>Chiles v. Salazar</u>, 146 S. Ct. 1010 (2026) -- which is now the case most on-point for questions pertaining to the constitutionality of regulations of physician speech -- Physician Plaintiffs are likely to succeed on the merits for the following reasons.

First, a physician's speech "does not become conduct just because the State may call it that.  Nor does [physician] speech become conduct just because it can also be described as a 'treatment,' a 'therapeutic modality,' or anything else." <u>Chiles v. Salazar</u>, 146 S. Ct. 1010, 1023 (2026) (The rights protected by the First Amendment "cannot be renamed away or their protections nullified by 'mere labels.'").  As the <u>Chiles</u> court explained, "[u]nder the First Amendment, what matters is not how a government describes its law or whether the law may regulate conduct in other circumstances.  What matters is whether, in fact, the law regulates speech in the case at hand." <u>Id.</u> at 1023-24.

The facts here are strongly analogous to the facts giving rise to the Court's ruling in <u>Chiles</u>.  In <u>Chiles</u>, the Court observed that "Colorado's law does not just regulate the

24

content of Ms. Chiles's speech.  It goes a step further, prescribing what views she may and may not express." Id. at 1024.  The Boards' Policy at issue here is subject to precisely the same critique.  The Colorado regulation at issue in Chiles prohibited Ms. Chiles from "voic[ing] certain 'perspective[s]' the State disfavors when speaking with consenting clients." Id. The Policy here similarly prohibits Physician Plaintiffs from voicing perspectives on COVID that the Boards disfavor. See In re Accusation Against Ana Reyna, M.D., Case No. 800-2021-076688, Accusation (Medical Board of California).

Second, post-Chiles, the Boards cannot ground enforcement of the Policy under their Section 2234 standard-of-care powers.  That is because the Chiles court rejected the right of the state to "transform[] prevailing opinion into enforced conformity," even for purposes of maintaining a particular standard of care.  Chiles, 146 S. Ct. at 1029.  "A prevailing standard of care may reflect what most practitioners believe today, but it cannot mark the outer boundary of what they may say tomorrow." Id.  Under Chiles, then, the Boards in this case cannot avoid the First Amendment's watchful eye by appeals to California's interest in protecting public health and safety. See id. ("[T]he First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country.")

The relationship between the physician speech at issue and the nature of the medical care the physician provides is illustrative of the limits of the standard-of-care basis for

25

regulating physician speech.  In Chiles, the Supreme Court rejected Colorado's asserted right to regulate physician speech relative to a certain standard-of-care for talk therapists.  See id. at 1028.  In other words, Chiles held that a state's standard-of-care may not be used to curtail a physician's First Amendment right to free speech even when speech is the therapeutic modality used to treat patients.

This is significant for evaluating the Boards' Policy here because the Physician Plaintiffs named in this case are not talk-therapists.  Accordingly, the regulated speech of Physician Plaintiffs is one step further removed from the standard of care than was the case for Ms. Chiles.  Said another way, if physician speech cannot be regulated even in the context of talk therapy where the speech is the therapeutic modality, the regulatory authority asserted by the state here is likely on even weaker footing because the speech of Physician Plaintiffs is more concretely separable from the administration of medical care.

Third, the Boards' Policy is almost certainly subject to strict scrutiny review because the Policy regulates the content of Physician Plaintiffs' speech and discriminates on the basis of viewpoint.  "When the government seeks not just to restrict speech based on its subject matter but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject, 'the violation of the First Amendment is all the more blatant.'"  Id. at 1021 (citation omitted).  As Justice Gorsuch observed, "'[v]iewpoint discrimination,' . . . represents 'an egregious form' of content regulation, and

26

governments in this country must nearly always 'abstain' from it."  Id.

Fourth, the state likely cannot successfully sidestep strict scrutiny of the Policy by invoking the speech-incident-to-conduct doctrine.  In Chiles, the Court addressed the limitations of the doctrine and clarified that "the question is not whether a law mostly addresses conduct and only sometimes sweeps in speech."  Id. at 1026.  Rather, the proper analysis focuses on determining whether the law at issue falls within either of the only two categories the doctrine recognizes:  Laws that restrict speech "only because it is integrally related to unlawful conduct" and laws that restrict speech "only for reasons unrelated to its content."  Id.  Neither category is likely to be applicable here because (1) the Policy does not purport to regulate physician speech that is related to some independent criminal act, and (2) since the Policy restricts only certain viewpoints, it cannot be said to restrict speech for reasons unrelated to its content.

For these reasons, the court finds that Physician Plaintiffs are likely to succeed on the merits of their First Amendment claim challenging enforcement of the Policy as an impermissible violation of their free speech rights. "Consistent with the First Amendment's jealous protections for the individual's right to think and speak freely, this Court has long held that laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional.'" Id. at 1021 (citation omitted).

B.    Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original). As discussed in the analysis on the merits, here Physician Plaintiffs have demonstrated that the Policy likely unconstitutionally burdens their First Amendment speech rights.

That also means they have made a sufficient showing of irreparable harm, as it is "well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017) (internal citation omitted). This is particularly true when the First Amendment is implicated, because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (citing New York Times Co. v. United States, 403 U.S. 713 (1971)).

C.    Balance of Equities and the Public Interest

Finally, both the balance of equities and the public interest strongly favor the entry of a preliminary injunction. When the government is the opposing party, these last two factors merge. Nken, 556 U.S. at 435.

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 187 (2024). Because plaintiffs have demonstrated that the Boards' Policy

discriminates against viewpoints disfavored by the state, there is an especially compelling public interest in enjoining its enforcement for the remainder of these proceedings.

Indeed, "the First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country." Chiles, 146 S. Ct. at 1029. "It reflects instead a judgment that every American possesses an inalienable right to think and speak freely, and a faith in the free marketplace of ideas as the best means for discovering truth." Id. And because the injunction here is narrowly tailored, extending no further than is necessary to afford Physician Plaintiffs complete relief, defendants will suffer no substantial harm as a result of its imposition. See Trump v. CASA, Inc., 606 U.S. 831, 861 (2025). Accordingly, the balance of equities and public interest weigh in favor of granting a preliminary injunction.

D.   Bond

The court finds that no bond is necessary in this case because defendants' compliance with the preliminary injunction would create no apparent risk of monetary loss. See Potts v. Cnty. of Trinity, No. 2:12-cv-01793 JAM CMK, 2012 WL 13042442 (E.D. Cal. Aug. 23, 2012); see also Habitat Educ. Ctr. v. United States Forest Serv., 607 F.3d 453, 458 (7th Cir. 2010) (recognizing there is no reason to require a bond in cases in which "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction.").

V.   Conclusion

29

Because Physician Plaintiffs have demonstrated a likelihood of success on the merits of their as-applied challenge, that they have suffered and will continue to suffer irreparable harm absent preliminary relief, and that the balance of equities and public interest favor granting injunctive relief, plaintiffs' motion for preliminary injunction will be granted. See Winter, 555 U.S. at 20.

IT IS THEREFORE ORDERED that plaintiffs' renewed motion for preliminary injunction (Docket No. 49) be, and the same hereby is, GRANTED AS TO PHYSICIAN PLAINTIFFS (Dr. Pierre Kory, Dr. Le Trinh Hoang, and Dr. Brian Tyson) ONLY.  Pending a final determination on the merits of this action, defendants Attorney General Rob Bonta, Reji Varghese, Executive Director of the Medical Board of California, and Erika Calderon, Executive Officer of the Osteopathic Medical Board of California, and their officers, agents, employees, and all persons in active concert or participation with them who receive actual notice of this order, are hereby enjoined from investigating, prosecuting, accusing, or sanctioning Physician Plaintiffs (Dr. Pierre Kory, Dr. Le Trinh Hoang, or Dr. Brian Tyson) based on the viewpoint of the information, recommendations, or advice they give a patient about COVID-19, including a their departure from the position of the public health authorities.

This injunction does not prevent the Boards from investigating, prosecuting, or disciplining Physician Plaintiffs, or anyone else, for fraud, for actual negligent treatment, for prescribing violations, for a genuine failure of informed consent

30

as to a material risk or a reasonable alternative to treatment, or for other conduct independently regulable without reference to their viewpoints on COVID-19.  The Boards may not recharacterize as an informed-consent violation or a standard-of-care departure any refusal by a Physician Plaintiff to convey the government's position on a contested question concerning COVID-19.

Dated:  August 5, 2026

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

31